# Illinois Official Reports

## Appellate Court

*Motorola Solutions, Inc. v. Zurich Insurance Co.*,
2015 IL App (1st) 131529

| | |
|---|---|
| Appellate Court Caption | MOTOROLA SOLUTIONS, INC., Plaintiff-Appellee, v. ZURICH INSURANCE COMPANY and ASSOCIATED INDEMNITY CORPORATION, Defendants-Appellants (Continental Casualty Company; National Fire Insurance Company of Hartford; Transportation Insurance Company; American Casualty Company of Reading, Pennsylvania; National Union Fire Insurance Company of Pittsburgh, Pennsylvania; Liberty Mutual Fire Insurance Company; and Liberty Insurance Company, Defendants). |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-13-1529, 1-13-1530 cons. |
| Filed | May 29, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-1902; the Hon. Daniel J. Pierce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James R. Murray, of Tressler LLP, of Chicago, and Jack Thomas, of Crowell & Moring LLP, of New York, New York, for appellant Associated Indemnity Corporation.<br><br>Michael M. Marick and Karen M. Dixon, both of Meckler Bulger Tilson Marick & Pearson LLP, of Chicago, for appellant Zurich Insurance Company.<br><br>James A. White and Brian J. Murray, both of Jones Day, of Chicago, and Peter D. Laun and Matthew R. Divelbiss, both of Jones Day, of Pittsburgh, Pennsylvania, for appellee. |

JUSTICE GORDON[*] delivered the judgment of the court, with opinion.

Presiding Justice Palmer and Justice McBride concurred in the judgment and opinion.

## OPINION

¶ 1    The instant consolidated appeals arise from the interpretation of two nearly identical settlement agreements entered into by plaintiff Motorola Solutions, Inc. (Motorola), one with defendant Zurich Insurance Company (Zurich) and one with defendant Associated Indemnity Corporation (Associated).[1] The parties disagree about whether the settlement agreements contained provisions that operated to release defendants from providing insurance coverage for certain claims against Motorola. Each party filed a motion for summary judgment on the issue, all of which were denied after the trial court found that the releases were ambiguous. The parties conducted discovery and a bench trial was held on the issue of the scope of the releases' language. The trial court concluded that the parties had not released Motorola's claims, and defendants now appeal. On appeal, defendants claim that the trial court erred in not granting summary judgment in their favor and erred in finding that the claims had not been released after the bench trial. Additionally, defendants claim that the trial court erred in denying their joint motion to compel discovery of certain Motorola documents. For the reasons that follow, we affirm.

¶ 2                              BACKGROUND

¶ 3    We note that the parties' briefs and portions of the record on appeal were permitted to be filed under seal, including the settlement agreements at issue on appeal. While we respect the parties' wishes to keep confidential material private, our consideration of the trial court's interpretation of the settlement agreements will necessarily require us to discuss details of these documents in the instant appeal. However, we only include those details necessary to our resolution of the issues on appeal.

¶ 4                             I. Complaint

¶ 5    On February 18, 2011, Motorola filed a complaint for declaratory judgment and breach of contract against a number of insurance companies, including Zurich and Associated; the complaint was amended on July 1, 2011, and again on February 22, 2013. Motorola sought

---

[*]Oral argument on the instant consolidated appeals was heard by a different panel of justices. However, the current panel has considered the audio of oral argument, in addition to the parties' briefs and the record on appeal.

[1]Associated is a subsidiary of Fireman's Fund Insurance Company and both names are used interchangeably throughout the record on appeal. For the sake of consistency, we use the name "Associated."

the defendants to provide it legal representation to defend Motorola and/or coverage for defense costs under insurance policies issued by each of the defendants for four underlying personal injury actions in which claims were asserted against Motorola. The complaint identified one Associated policy with a policy period from July 1, 1983, through July 1, 1985, and 13 Zurich policies with coverage from January 31, 1963, through July 1, 1983, and from July 1, 1985, through July 1, 1987.

¶ 6         The four underlying actions (the clean room cases) alleged that Motorola was liable for injuries that children of former Motorola employees and contractors allegedly sustained as a result of exposure to various chemicals in "clean rooms" in Motorola manufacturing facilities. According to Motorola's complaint, from the 1960s through 2003, Motorola operated facilities that manufactured, among other things, semiconductor products. These facilities included certain rooms that were designated as "clean rooms" in which the semiconductor products were manufactured, which "were designed to prevent dust and other similar materials from contacting semiconductor components during the manufacturing process." The clean room cases all involved substantially similar allegations, in general alleging that hazardous or toxic materials were present in the "clean rooms" and that "either the father, the mother, or both worked in a Motorola clean room facility for some period of time before, and in a number of cases after, the plaintiff child was born; often the period of employment [was] alleged to have continued through the *in utero* period. The plaintiffs generally claim[ed] that the children were injured as a result of parents working in clean rooms."

¶ 7         Motorola's complaint alleged that one or more of the insurer defendants had a duty to defend and/or pay defense costs in the clean room cases and that by failing to do so, the defendants had breached their obligations to Motorola under the insurance policies.

¶ 8         The complaints in the underlying clean room cases were attached to Motorola's complaint. The complaints alleged that the parents of the plaintiff children had been employed at Motorola facilities, where they "worked with and [were] exposed to harmful chemicals and substances that were utilized in the process of manufacturing semiconductor devices." The employees were required to use "teratogenic and reproductively toxic compounds" in the clean rooms, but "[n]o generalized ventilation system was configured explicitly to protect the workers from inhalation or skin exposure to the liquids, vapors, gases and fumes from the chemicals" and "[a]t relevant times[,] these chemicals have been components of the recirculated air in the clean room, have remained in the recirculated air mixture and have not been removed from it." These chemicals "were defective, unsafe and/or unreasonably dangerous" and caused the children to become "severely and permanently injured."

¶ 9         On August 5, 2011, Zurich filed its answer and affirmative defenses and also included a counterclaim in which it alleged that Motorola had released all of its claims for coverage for the clean room cases in a settlement agreement and release entered into with Zurich in November 2003 (the Zurich release).

¶ 10        On August 8, 2011, Associated filed its answer and affirmative defenses and also included a counterclaim alleging that it had no defense obligation for the clean room cases due to a settlement agreement and release that was executed between Associated and Motorola on May 30, 2003 (the Associated release).

## II. Releases

The releases between Motorola and the two insurers are at the heart of the instant appeal. While the Zurich release and the Associated release are two separate documents executed at different times, the substantive provisions of the releases are nearly identical.

The Associated release was executed on May 30, 2003, and included "whereas" clauses providing, in relevant part:

> "WHEREAS, Motorola has been named in several lawsuits by private parties in Arizona for alleged bodily injury and property damage relating to Motorola's disposal of hazardous substances in the Phoenix area ***, has been identified as being responsible for the investigation and remediation of contamination at and around numerous sites around the United States ('the Known Sites,' ***), and may be liable for claims asserted by the United States Environmental Protection Agency ('USEPA'), the Arizona Department of Environmental Quality ('ADEQ') and/or other similar state or local regulatory authorities or private individuals for alleged harms as a result of contamination at and/or around the Known Sites (collectively, the 'known Environmental/Toxic Tort Claims');
>
> ***
>
> WHEREAS, [Associated] has disputed Motorola's claim of entitlement to defense or indemnity in connection with the known Environmental/Toxic Tort Claims;
>
> * * *
>
> WHEREAS, Environmental/Toxic Tort Claims may in the future be asserted against Motorola with respect to the Known Sites and/or additional Sites;
>
> WHEREAS, Motorola and [Associated] now desire to compromise, settle and adjust fully and finally all disputes which now or hereafter may exist between them with respect to any and all claims, known and unknown, past, present or future, which have arisen or may arise under any and all coverages of the Policies for 'Environmental/Toxic Tort Claims' (as that term is defined herein) on the terms hereinafter set forth."

The release contained an extensive definition for "Environmental/Toxic Tort Claims," which we reproduce in full:

> " 'Environmental/Toxic Tort Claim(s)' means:
>
> i. any past, present and future Claim involving Motorola, whether presently known, unknown or unknowable, involving actual, alleged, threatened or potential property damage (or injury to property or damage to natural resources including but not limited to 'NRD' or 'natural resource damages'), bodily injury (including sickness, disease, disability or death at any time resulting therefrom), mental injury, mental anguish, shock, emotional distress, fear of injury (including Claims seeking medical monitoring or damages for care and loss of services), personal injury and claims to recover clean-up or remediation costs (including but not limited to costs incurred and sums expended, or which may in the future be incurred or expended for investigation, removal, distribution, treatment or containment), involving actual, alleged, threatened or potential environmental pollution, environmental contamination or other injurious environmental conditions, including exposure to smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste

materials or other environmental contaminants or pollutants, petroleum or natural gas or derivatives thereof, including without limitation, any hazardous waste as defined in 42 U.S.C. § 9601 or any substance regulated now or in the future by any government entity to protect human health or the environment from injury, damage or contamination.

ii. 'Environmental/Toxic Tort Claim(s)' shall include Claims asserted under CERCLA, RCRA or equivalent state statutes or common law, whether at law or equity, and whether sounding in tort, contract, equity, nuisance, trespass, negligence or strict liability. 'Environmental/Toxic Tort Claim(s)' further includes, but is not limited to, demands for costs incurred and sums expended, or which may in the future be incurred or expended, for investigation, removal, distribution, treatment or containment of environmental contamination, or incurred in relation to environmental clean-up or remediation costs, whether known or unknown, including but not limited to Claims involving the properties or operations of Motorola.

iii. The term 'Environmental/Toxic Tort Claim' shall not include any past, present or future Claim or portion of any Claim against Motorola:

a. alleging or involving injury or damage caused or allegedly caused by or arising from a product sold by Motorola, a product containing materials sold by Motorola, or a product that contains component parts manufactured by Motorola, including but not limited to two-way radios, cellular telephones, or any product that utilizes or emits RF radiation, in which such injury or damage occurs or is alleged to have occurred after the product or component part has been sold by Motorola or after such product or component part has left Motorola's possession, custody, or control, and before the product has become a waste product or become part of a waste product; or

b. alleging or involving injury or damage caused or allegedly caused by, arising from or related in any way to asbestos or asbestos-containing materials."

¶ 15    A " 'Claim' " under the release "means any past, present or future claim, demand, order, directive, request, counter-claim, affirmative defense, PRP letter, PLP letter, NOR, request for information, notice, damage, lien, contract, indemnity to defense obligation, agreement, letter, inquiry, promise, liability, loss, cost, expense, action, suit, cause of action, cross-claim, third-party action, notice of liability or potential liability, arbitration or mediation demand, or notice of statutory or regulatory obligation, of any kind whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, suspected or anticipated, direct, indirect or consequential, whether at law, equity, admiralty or otherwise, and whether sounding in tort, contract, equity, trespass, negligence, strict liability or any other statutory, regulatory, administrative or common law cause of action of any sort."

¶ 16    The release provided that "[t]his Agreement prevails over prior communications regarding the matters contained herein between the signatories hereto or their representatives. This Agreement has been reviewed by counsel for the signatories hereto, and shall not be construed against any signatory, each signatory expressly waiving the doctrine of *contra preferentem*." Finally, the release provided that "[t]his Agreement is an integrated Agreement and contains the entire Agreement regarding the matters herein between the signatories hereto, and no representations, warranties, or promises have been made or relied on by any signatory hereto other than as set forth herein."

¶ 17    The release also contained several statements that the release "is not intended to be, nor shall it be, constructed as an insurance policy interpretation" and that the release "is not a policy of insurance or a modification of any policy of insurance and the signatories do not intend same to be interpreted as such."

¶ 18    The Zurich release was executed on November 26, 2003, and was, in relevant part, identical to the language of the Associated release quoted above.

¶ 19                          III. Motions for Summary Judgment

¶ 20    On October 7, 2011, Zurich filed a motion for summary judgment, claiming that Motorola had previously released all claims for coverage for the clean room cases under the Zurich insurance policies. The same day, Associated also filed a motion for summary judgment on the same basis.

¶ 21    Also on October 7, 2011, Motorola filed a motion for partial summary judgment against Zurich and Associated on the issue of defendants' counterclaims and affirmative defenses concerning the releases, arguing that coverage for the clean room cases was not released because the clean room cases involved chemicals inside Motorola facilities and not chemicals released into the environment.

¶ 22    On April 13, 2012, Judge Daniel Pierce issued a written order denying the parties' motions for summary judgment. The trial court noted that "[defendants'] position stems from a number of lawsuits filed beginning around 1991 against Motorola where Motorola was sued for polluting the groundwater, soil, and air near its facilities in Arizona. Motorola submitted a claim to Defendants in those cases and the Insurers disputed coverage. The parties eventually decided to settle their disputes and, in 2003, Motorola entered into separate but substantially similar settlement agreements and releases (Releases) with Defendants which relieved them of their duty to defend Motorola for past, present, and future 'environmental/toxic tort claims.' " The lawsuits concerning the Arizona pollution are referred to by the trial court and the parties as the "Valley litigation" or the "Valley claims."

¶ 23    The trial court found that "[i]t can be inferred from the text of the Releases that at the time the Releases were executed the complaints pending against Motorola dealt with outdoor pollution caused by Motorola. The context in which the parties entered into the Releases tends to favor the interpretation advanced by Motorola. The use of the term 'environmental' in the Releases would appear to only relieve the insurers of their duty to defend future cases in which Motorola is alleged to have caused harm by polluting or contaminating areas outside of its facilities." The court pointed to the decision of *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473 (1997), and noted that the Illinois Supreme Court had explained that traditional environmental contamination "is contamination of land, the atmosphere or water." The court also noted that the Illinois Environmental Protection Agency had consistently limited its authority under the federal Clean Air Act to outdoor air and that the legislature had given the agency the authority to take action whenever hazardous substances were " 'release[d] into the environment' " but specifically excluded " 'any release which results in exposure to persons solely within [a] workplace' " (quoting 415 ILCS 5/3.395 (West 2010)).

¶ 24    The trial court found that "[t]he language used in the Releases to define environmental/toxic tort is the prototypical language used in pollution exclusions for insurance policies." The court again pointed to *Koloms*, noting that the Illinois Supreme

Court had held that standard-form pollution exclusion clauses in commercial general liability insurance policies did not apply in cases of indoor pollution and that an insurer must defend such claims. The trial court found that "[b]ecause the language used in the pollution exclusion in *Koloms* is virtually identical to that used in the Releases, it is not unreasonable to infer that the court would treat this case the same way and hold that such an exclusion does not apply to indoor air." However, the court noted that the *Koloms* court was interpreting an insurance policy and had construed the policy against the insurer; by contrast, "[h]ere, the Releases contain *anti-contra preferendum* clauses so the Court will not construe the Releases against either party."

¶ 25    The trial court noted that "[i]n assessing the insurers' position, the Court is cognizant of the fact that the language of the Releases is quite broad," contemplating "inclusion of incidents that are not necessarily identical to the cases that gave rise to their execution." "Motorola agreed to release Zurich and Associated Indemnity from defending it against past, present and future claims, whether known, unknown or unknowable"; thus, "[t]he insurers' argument that the Releases essentially relieved them of the duty to defend virtually all cases pertaining to injuries from toxic exposure is not unreasonable."

¶ 26    The court concluded that "[t]he parties to these Releases provided their own definition for environmental/toxic tort claims and it is not clear whether the clean room suits are within the scope of that definition. The interpretations advanced by both Motorola and the insurers are reasonable. As a result, the Court cannot determine the intention of the parties solely based upon the plain language of the Releases."

¶ 27    The trial court also considered whether the " 'carve-out' provisions" in the releases supported the insurers' argument that the clean room suits fell within the scope of the releases. The court noted that the insurers had argued that if Motorola's interpretation of the meaning of "environmental claim" was adopted, then "there would have been no purpose for excluding asbestos claims and products claims because those claims would have been outside the scope of the Releases in the first place." The court found that "[a]s the Court looks to give meaning to each provision of the contract, this point is well taken." However, the court noted that "even though the carve-out provisions might be indicative of the parties' intent, the fact that they carved out exceptions to the scope of the Releases does not change the definition the parties ascribed to 'environmental/toxic tort claims.' If the insurers' argument on this point is accepted, the Releases become unreasonably broad and encapsulate claims which could not remotely be considered environmental claims. The interpretation advanced by the insurers regarding these carve-out provisions essentially reads the term 'environmental' out of the Releases. The Releases also cannot be interpreted in a manner where every claim not expressly exempted from their scope must be considered included." Therefore, the court found, "the Court cannot determine as a matter of law whether the clean room cases fall within the scope of the Releases."

¶ 28    The trial court summarized its analysis by noting that "[h]ere, the language of the Releases does not resolve whether the clean room cases fall within their scope. The term 'environmental/toxic tort' as it is used in the Releases is ambiguous. Certain factors favor Motorola's desired interpretation while others favor the interpretation proffered by the Defendants." In such a case, the court found that summary judgment was inappropriate and stated that "[e]ven though there are cross motions for summary judgment pending before the Court and the parties do not dispute the facts, reasonable persons could draw divergent

inferences from the facts at issue. Reasonable minds could disagree about the meaning of the term environmental/toxic tort claims as used in the Releases and whether the clean room cases fall within the scope of that term. It is clear that issues regarding this subject matter have been occurring around the country for years, but none of the parties to the Releases adequately, clearly or unambiguously protected themselves [from] the ramifications of such an event. Because the term is ambiguous, the parties must present further evidence regarding the intended meaning of 'environmental/toxic tort' for resolution by the trier of fact."

¶ 29                                    IV. Discovery

¶ 30      After the trial court's denial of the parties' motions for summary judgment, the parties engaged in discovery on the issue of the scope of the releases. As part of discovery, defendants filed a motion to compel the production of a document entitled the "CRSP Reference Notebook (Environmental),"[2] which they claimed would be relevant to show that Motorola considered clean room claims to be "environmental." The document was allegedly a compilation of memoranda drafted by a number of environmental and toxic tort attorneys working under Motorola's environmental, health, and safety group beginning in 1996, concerning a defense strategy for anticipated litigation over environmental chemical exposure in Motorola's clean rooms after IBM, a competitor of Motorola, had been sued for injuries and birth defects to children of employees and contractors who worked in IBM's clean room facilities. Motorola refused to produce the documents, arguing that the attorney-client privilege and work product doctrine applied. On November 28, 2012, the trial court ordered Motorola to produce the notebook to the court for *in camera* review, after which the court would "rule on whether the CRSP Notebook is relevant."

¶ 31      On December 10, 2012, at the beginning of trial, the trial court ruled on defendants' motion to compel production of the CRSP notebook. The court stated:

     "On the first topic with respect to the motion to compel, I reviewed the compilation of documents that are referred to as the CRSP notebook which is the Clean Room Safety Program notebook.

     The defendants moved to have the notebook[,] I'll refer to it as[,] produced in discovery. The plaintiff objected on the grounds of attorney-client privilege and work product, attorney work product privilege.

     The Court is going–and I did review the manual. I find it to be privileged information both as far as attorney-client matters and as to–and also that it is perhaps also work product information.

     Additionally, I'm ruling that it's not relevant to the issue before the Court today which is why we are here, and that is to determine what the phrase 'environmental toxic tort' means as used in the two releases in question in this declaratory action proceeding.

     I don't think work product or attorney-client information that was generated at least several years prior to the execution of this release is relevant to the Court's inquiry as to what the parties intended, what the parties meant and what they agreed to with respect to the term 'environmental toxic tort' in the context of the

_____
[2]"CRSP" is an abbreviation for "Clean Room Safety Program."

- 8 -

circumstances surrounding the execution of the questioned releases. So with that, that's the ruling on the motion to compel.

Now, that is not to say that a different ruling might–and I emphasize 'might'–be appropriate if this were an underlying declaratory judgment action on the issue of whether there was either a duty to defend or a duty to indemnify.

I know ultimately, that's the bone of contention between the parties, but at this juncture, the issue is what did the release that was executed in 2003 mean, what did the parties want it to mean and what did they bargain for and what did they get when they wrote it down and signed it."

¶ 32                                    V. Trial

¶ 33        As noted, the parties came before the trial court for a bench trial on December 10, 2012.

¶ 34                              A. Associated Witnesses
¶ 35                               1. Alexander Gillespie
¶ 36        Alexander Gillespie testified that he was a litigator with the law firm of Bonner, Kiernan, Trebach & Crociata and had represented Associated in connection with insurance coverage claims relating to the "Valley litigation," which was "[a] group of both litigated and nonlitigated claims arising out of environmental contamination or releases at Motorola sites in the Phoenix area." The types of claims were "[b]oth what I'll call environmental and toxic tort claims, meaning contamination itself of the ground and groundwater, et cetera, and claims, for example, by residents of the area that toxic substances had migrated through the groundwater into their houses and they had been injured by exposure to the toxic substances that way." The Valley claims were "long-tail" or "delayed manifestation" claims.

¶ 37        Gillespie testified that Associated engaged Motorola in discussions about resolving coverage issues concerning the Valley litigation and a meeting between the two occurred in October 2002, with Gillespie, Eric Billeter, Shirley Shean, and J.P. Salgado present on behalf of Associated. Associated had prepared a PowerPoint presentation "which culminated–we were trying to get policy releases or policy buybacks from Motorola with respect to *** the [Associated] policies so we went through various types of claims that we were aware of that Motorola was involved with and various types of exposures, money that had been paid, both defense and indemnity, on those various types of claims and applied a coverage analysis to those claims and arrived at essentially what we'd valued as the–the dollar value of the [Associated] exposure with respect to those claims. And then we presented an offer of a greater amount for policy buybacks." Gillespie testified that Associated offered $4 million "[f]or full policy releases of all the Motorola policies," meaning that "[i]t's essentially as if you tear up the policies and they never existed. No claims could ever be presented against those policies again." Gillespie testified that there was "some dialogue" at the meeting, but that Motorola expressed reluctance to release asbestos or cell phone claims, because "[t]hey didn't think that they could put a value on the exposure of release of those claims."

¶ 38        On January 29, 2003, Gillespie sent a letter to Mike Foradas at Kirkland & Ellis "providing a draft form of settlement agreement or release for a policy buyback with a carveout for asbestos-related claims." The scope of the proposed release was "[f]ull policy releases for all of the policies other than potential claims for insurance coverage of

- 9 -

asbestos-related claims." After sending the draft agreement to Motorola, Associated continued to engage in its analysis of the claims and was also preparing an actuarial analysis of information concerning cell phone claims that it had received from Motorola.

¶ 39     On March 17, 2003, a few days before a subsequent March 19, 2003, meeting with Motorola, Associated received a draft settlement agreement from Foradas. The draft agreement was "certainly much more restrictive" than the earlier draft Associated sent to Motorola and was "essentially a release of Valley type claims, be they in the Valley claims themselves or similar claims elsewhere." The draft agreement removed the language releasing "any and all coverages of the Policies" and changed it to release "environmental/toxic tort claims" under the policies; "environmental/toxic tort claims" was a reference to the Valley litigation and similar claims.

¶ 40     On March 19, 2003, Associated and Motorola met at Motorola's headquarters in Schaumburg, Illinois; Gillespie, Billeter, Salgado, Shean, and Noel Hehr were present on behalf of Associated, while Foradas from Kirkland & Ellis, Jack Montgomery from Jones Day, in-house counsel Kathleen Massey, corporate treasurer Garth Milne, and risk manager Joe Wojdula were present on behalf of Motorola. The meeting began with Foradas making a 45-minute PowerPoint presentation on behalf of Motorola, responding to Associated's presentation from the first meeting; "Motorola went through their response to the factual assertions, legal assertions, coverage evaluation, things of that nature, and presented a counterdemand to [Associated's] offer of 4 million for what was then–by then, it was policy releases with an asbestos carveout." Motorola demanded $7.9 million "for what he called an environmental buyout," which Gillespie understood to refer to "the environmental and related toxic tort claims relating to the Valley sites and other sites," meaning the claims concerning groundwater pollution in Arizona.

¶ 41     The representatives from Associated responded to some of the issues raised by Foradas, then Hehr made a 20-minute actuarial presentation on Associated's behalf concerning the cell phone claims. The presentation culminated with a valuation of approximately $1.1 million for the cell phone claims. The representatives from Motorola were appreciative of Hehr's analysis, but expressed skepticism as to whether the assumptions underlying the analysis would come to pass. They additionally raised concerns about "EME claims," meaning claims concerning two-way radios and other types of products that would emit electromagnetic energy that would go beyond cell phones.

¶ 42     Associated made an offer of $5.5 million for "policy releases with carveouts for asbestos-related claims, cell phone claims and two-way radio claims." Motorola did not accept, because "[e]ssentially, it was they did not believe that it was possible to come up with a firm analysis and exposure evaluation of those claims, that it had been discussed at levels up to and again including the CFO level at Motorola and that they simply weren't willing to do that broad a release." Associated made a subsequent offer of $5.1 million "[f]or environmental and toxic tort releases with those terms having to be defined in the agreement." Motorola did not accept it and Foradas returned with a demand of $6.3 million, indicating that "essentially, a significant part of the difference in Motorola's evaluation of that environmental toxic tort release and [Associated's] evaluation of the toxic tort release was that Motorola believed that there was a premium in terms of money that would be appropriate for granting the broader toxic tort release that Motorola was at that point willing

to give." Associated agreed to the terms, but responded with a counteroffer of $6 million, which Motorola accepted.

¶ 43 Gillespie testified that he took handwritten notes at the March 19, 2003, meeting and that he prepared typed-up minutes relating to the meeting within two days of the meeting, both of which he did as part of his regular practice.

¶ 44 Gillespie testified that after the March 19, 2003, meeting, he prepared a draft settlement agreement to reflect the outcome of the meeting, which Gillespie emailed to Foradas on April 7, 2003. The new agreement contained a "Definitions" section, which had not been contained in the previous drafts, including definitions for "claims" and "environmental/toxic tort claims." The definition of "environmental/toxic tort claims" had three parts, and Gillespie testified that "[i]n general terms, one defines 'environmental' and 'toxic tort.' Two makes clear that certain things are within the definition of 'environmental' and 'toxic tort.' And three specifies certain things that would not–that could not be deemed to be within the definition of 'environmental' and 'toxic tort.' "

¶ 45 Gillespie testified that after sending the draft to Motorola, Motorola responded by attempting to insert certain words into the definition of "environmental/toxic torts." Where Associated's draft referred to "pollution" and "contamination," Motorola's draft added the term "environmental," making the terms "environmental pollution" and "environmental contamination," and also added the term "into the environment" after "other environmental contaminants or pollutants." Associated deleted Motorola's insertions in its next draft. Motorola again attempted to add the same language, which Associated again deleted. Ultimately, Associated left the two insertions of the term "environmental" but did not permit the insertion of the term "into the environment" and Motorola agreed to the draft.

¶ 46 Gillespie testified that his concern as to Motorola's attempt to add the term "into the environment" was that policyholders had been using that phrase to attempt to persuade courts to read pollution exclusions in insurance policies narrowly so as not to include exposure to hazardous substances indoors. Gillespie testified that he "was concerned that it might leave the agreement subject to a similar argument if there were disputes in the future and that would result in someone arguing for a more restrictive application of the release than had actually been agreed to."

¶ 47 On cross-examination, Gillespie testified that in the presentation Associated made to Motorola in October 2002, one of the topics was "non-environmental claims," during which asbestos and cell phone claims were discussed, and another topic was "environmental/toxic tort claims," during which the Valley claims were discussed. Gillespie admitted that, during the "environmental/toxic tort" portion of the presentation, there was no claim discussed "that did not involve some form of actual or alleged release of [a] hazardous substance into the environment by Motorola." Gillespie further admitted that, up to and through the draft Motorola submitted on March 17, 2003, the term "environmental/toxic torts" was a reference to the Valley litigation and similar claims.

¶ 48 2. Jean-Pierre Salgado

¶ 49 Jean-Pierre Salgado testified that in 2001 or 2002, he worked for Associated as a senior environmental consultant in Associated's historical claims unit, which was a unit "that was put together by [Associated] to manage old policies that were general liability policies that had environmental coverage in them." Salgado testified that he was present at two meetings

between Associated and Motorola. The first meeting occurred in October 2002 and Associated presented an offer of $4 million for a policy buyback. The second meeting occurred in March 2003 at Motorola's headquarters in Schaumburg. Salgado, Billeter, Shean, Gillespie, and Hehr were present on behalf of Associated, while Wojdula, Massey, and Foradas were present on behalf of Motorola. Foradas made a presentation "which was essentially Motorola's response to [Associated's] initial offer of settlement that took place several months before," which was followed by Hehr's presentation on cell phones. There was then a "back-and-forth discussion" concerning the scope and dollar amount of the release, with Billeter and Gillespie primarily speaking on behalf of Associated and Foradas and Massey speaking on behalf of Motorola. Salgado testified that there were no terms written at that point, but that "we settled for a buyback of the environmental and toxic tort claims into the future, we excluded the asbestos and cell phone part of it. And the amount that was agreed to was $6 million."

¶ 50    Salgado testified that he did not work on asbestos or cell phone claims while at Associated because those would not have been considered environmental claims.

¶ 51                                    3. Eric Billeter

¶ 52    Eric Billiter testified that he was a claim manager at Associated and his team handled coverage actions involving asbestos, toxic tort, and environmental claims. The first settlement agreement proposed by Associated was for $4 million for a policy buyback. The $4 million valuation consisted of approximately $3.6 million for known claims, and, "[b]ecause the terms of that offer were policy buybacks *** we offered additional consideration for all the other exposures that Motorola might face in the future." After Motorola indicated at the first meeting that it was unwilling to release asbestos claims, there was "back and forth" between the parties, culminating in another draft settlement agreement proposed by Associated, which was a "complete release" with a carveout for asbestos claims for $4 million. The proposed settlement agreement contained a "whereas" clause relating to the Valley litigation, but Billeter testified that the clause did not limit the scope of the release.

¶ 53    Billeter testified that on March 17, 2003, two days before a scheduled meeting with Motorola, Motorola sent a draft settlement agreement that was "a much more limited release." The release was "an environmental release" and also released claims similar to the Valley claims. Associated did not accept this offer. At the March 19 meeting, Billeter, Shean, Salgado, Gillespie, and Hehr were present on Associated's behalf, while Foradas, Montgomery, Massey, Milne, and Wojdula were present on Motorola's behalf. Billeter testified that Associated initially rejected Motorola's offer because the representatives were "[d]isappointed in the settlement terms and the dollar amount that they wanted from us." However, by the end of the meeting, they ultimately settled for a "full environmental and full toxic tort release under the policies," with carveouts for asbestos, cell phones, EME claims, and product claims. Billeter testified that clean room claims would have been released "[b]ecause it's covered under the definitions in the agreement." Billeter further testified that Motorola's initial offer changed "[i]n terms of dollars and scope of the release that they were willing to provide to us."

¶ 54    Billeter testified that at the second meeting, after Foradas' presentation on Motorola's behalf, there was a break and then Associated responded to some of the points raised by Foradas in his presentation and Hehr made a presentation on cell phone litigation. Following

Hehr's presentation, Motorola's representatives indicated that they could not release cell phone claims and for the first time indicated that they were also concerned about Motorola's exposure relating to two-way radios. Associated made a counterproposal for $5.5 million with carveouts for asbestos, cell phones, and two-way radios. Motorola did not accept the offer and indicated that there were also concerns about EME claims and Motorola would not release products claims. After another break, Associated came back with another counterproposal of $5.1 million "for a complete environmental and toxic tort claim release. And we were carving out asbestos, cell phones and EME claim[s] and products at that point." Billeter testified that the terms used "had to be defined in the agreement because now we're at a different point of what the agreement was going to be." The "environmental and toxic tort" offer Associated was proposing "was broader than what Motorola had proposed" in that "[i]t was a complete environmental and toxic tort claim release that they could never tender another environmental or toxic tort claim subject to how those terms were going to be defined in the settlement agreement." Associated made the offer at that time because "at that point in time, we knew we weren't going to be able to get a complete policy buyback. You know, it was the end of the negotiations. They were adamant they couldn't release product claims or cell phone claims or asbestos, and we always wanted through the history of the negotiations the broadest release we could possibly get." Motorola did not accept the offer, but made a counterproposal of $6.3 million, noting that "there was some additional consideration in that for unknown toxic tort claims." Associated responded with an offer of $6 million, which was accepted. Gillespie then took the lead in drafting the settlement agreement, which was sent to Motorola.

¶ 55    Billeter testified that he composed an email to senior management concerning the settlement a few days later "[t]o notify management that the case had settled and these were the terms of the settlement."

¶ 56    On cross-examination, Billeter admitted that clean room claims were never discussed during negotiations even though Shean handled clean room cases at that time for a different insured, IBM. Billeter testified that Associated never raised the issue of clean room claims, "[b]ut we asked them what were the things that they were worried about."

¶ 57                                    B. Zurich Witnesses
¶ 58                                    1. Steven Dale Pearson
¶ 59    Steven Dale Pearson testified that he was an attorney at Meckler, Bulger, Tilson, Marick & Pearson and represented Zurich in connection with the Valley litigation. Pearson became involved with the Valley litigation in 1994, and the disputes between Motorola and Zurich concerning coverage continued for over a decade until, in 2001, Motorola and Zurich began to explore the possibility of settling their disputes. In discussing settlement, Pearson spoke primarily with Foradas.

¶ 60    There was an initial mediation session in May 2002 in Washington, D.C., where the conversation focused on the Valley litigation. Zurich demanded $57 million from Motorola "which was the costs that had been expended thus far in defending Motorola in the underlying litigation on the premise that notice was late, they were never entitled to coverage in the first instance and therefore would not have been entitled to any defense costs." Motorola, by contrast, demanded $56 million from Zurich, "representing settlement of the underlying litigation that was at issue and the sites that they put us on notice of." Thus,

Motorola and Zurich were approximately $114 million apart before the mediation. The mediation was unsuccessful.

¶ 61     A second mediation session was set for November 2003. Zurich reduced its demand to $19 million and requested a release concerning the Valley sites and 56 related sites. Motorola reduced its demand to $23 million and requested both parties release all claims relating to the Valley litigation and the 56 sites, with an exception for asbestos claims or product liability claims. In addition to the letter sent by Motorola outlining the demand, Motorola also included a copy of a private demand communicated to the mediator at the outset of the mediation process; Pearson testified that he learned from the private demand letter "that Mr. Foradas was also talking about an environmental buyout of some sort regarding matters in addition to those sites that were what I call the known sites at that time," which represented a "possible" expansion of the scope of settlement discussion. Motorola also included a copy of the Associated release, which Zurich had requested. In reading the Associated release Pearson's "reaction was this changed the scope of what we were talking about from a settlement standpoint because this was much broader than the scope that we had been talking about before. This agreement did not speak to the Valley litigation, did not speak to the underlying litigation that comprised the Valley litigation and the 56 sites which were all of the terms that I had been talking about but rather something much broader. And I was very pleased to get it because I saw it as an opportunity now to break through the logjam from the settlement standpoint."

¶ 62     Pearson testified that at the mediation in November 2003, he, Bob Edwards, Ruth Kopec, and Brent Graber were present on behalf of Zurich and Foradas, Montgomery, and Massey were present on behalf of Motorola. Pearson testified that he "had an assurance going into that mediation that Motorola would accept the same terms–terms, language of the settlement agreement, with my client that they had agreed to with" Associated, so the entire focus of the mediation was on the dollar amounts. The mediation resulted in the parties agreeing to a "walkaway," with neither Zurich nor Motorola paying any money.

¶ 63     Pearson testified that at the time, he examined the release, and there was no limitation to outdoor claims. Instead, he testified that "[w]e were settling indoor claims to exposure to [toxic chemicals] as part of the underlying litigation," since several of the plaintiffs in the Valley litigation had alleged exposure to toxic chemicals "in their homes in their drinking water and showering in it in their homes." Pearson further testified that no one told him that that the release was intended to release only outdoor claims or that the carveouts for asbestos and cell phone claims were not necessary but were only added as a precaution. Pearson was also unaware of the content of the negotiations between Associated and Motorola that resulted in the Associated release.

¶ 64                                    2. Robert Edwards

¶ 65     Robert Edwards testified that he worked for Zurich's environmental claims unit until 2008. The environmental claims unit was comprised of three groups: the pollution group, the mass litigation group, and the legal services group; asbestos claims were handled by the mass litigation group, and Zurich considered the claims handled by any of the three groups to be environmental claims. While at Zurich, Edwards worked for the mass litigation group for a short time, then moved to the pollution group. While in the pollution group, Edwards worked on the Valley litigation while Motorola and Zurich were engaged in coverage litigation.

Edwards attended the November 2003 mediation as a corporate representative of Zurich with authority to settle and Kopec, Graber, and Pearson also attended the mediation on Zurich's behalf.

¶ 66     Edwards testified that he received the Associated release prior to the mediation and considered it a "game changer in that the [Associated] release was an effort to provide a full environmental and toxic tort release with the exception of cell phone and product cases as well as asbestos." At the mediation, the parties negotiated until "eventually, it became a zero sum whereby no side ended up getting any type of a payout, but in exchange for that, there was a broad environmental release that basically included all types of environmental claims including toxic tort with the only carveout being along the lines that I previously discussed and mentioned which was products and specifically cell phones as well as asbestos."

¶ 67     On cross-examination, Edwards testified that he did not participate in any discussions with anyone from Motorola concerning the scope of the release.

¶ 68                                 C. Motorola Witnesses
¶ 69                                 1. Michael Foradas
¶ 70     Michael Foradas testified that he was a partner at Kirkland & Ellis and was Motorola's lead outside insurance coverage counsel in the coverage litigation concerning the Valley claims. He worked with Tom Campbell on the litigation, and Campbell handled the day-to-day matters. Foradas' primary contact in the Motorola law department concerning the litigation was Kathleen Massey.

¶ 71     Foradas testified that the Valley litigation was settled in late 2000 to 2001, and in early 2002, Motorola began to consider the possibility of resolving the coverage litigation without further litigation. Motorola's first effort was with Zurich, which was Motorola's primary insurance carrier for many years. The initial mediation took place in spring 2002. Motorola's first demand was for $35 million and proposed "a full environmental release for the sites that were in the Valley and the other company plant sites and remediation sites that we were discussing"; Foradas testified that an "environmental release would mean that Zurich was essentially absolved from any further liability for the Valley cases and for the other environmental pollution sites." Zurich demanded $52.2 million and proposed a release that was "essentially [a] mirror image[ ]" of Motorola's proposed release; Foradas testified that "[t]hey were the same release. We were talking about the same things." The first mediation "was a bust," as the parties were over $100 million apart and "[i]t was apparent very quickly that we weren't going to get anywhere at this mediation, and we agreed that we should adjourn indefinitely."

¶ 72     Motorola turned its attention to Associated, which had approached Motorola through Billeter about a settlement. Billeter informed Foradas that Associated would be interested in a full policy buyout, but Foradas responded that Motorola was not interested in that kind of release. Foradas informed Billeter that "we were interested in an environmental buyout or release, that we had–Motorola had a number of environmental sites, 50 some odd sites. He was obviously well aware of the Valley sites, but there were a number of others. Motorola had been managing those sites for some period of time. We were willing to negotiate a resolution of all those claims relating to those sites. We had, I think–we had our arms around in pretty good fashion the environmental claims so we were prepared to do that kind of settlement." Foradas also informed Billeter "on many occasions from the outset of the

litigation and also through our efforts to settle the case that we really had no interest in anything broader than that, that the company faced–it was a technology company, it faced sort of [an] uncertain future with regard to the kinds of claims it may face. We couldn't really value those claims, it would be both difficult to value them and probably impossible given that we had very little litigation at the time and that we weren't interested in releasing our insurance coverage that went back historically for, you know, claims that we really couldn't put a value on."

¶ 73    Foradas testified that "from the outset of our discussions with [Associated], one of the categories of claims we discussed resolving in the category that Motorola was interested in resolving were environmental and associated toxic tort claims so pollution claims at the various sites, clean up costs associated with those claims whether–usually ordered by the government under the CERCLA or RCRA programs and then also private property damage and bodily injury claims like those that had been asserted in the Valley by individuals who claimed either property damage from environmental contamination or personal injuries relating–bodily injuries relating to environmental contamination at various Motorola plant sites." This understanding of "environmental/toxic tort claims" was the way that Associated "described what they were talking about from day one."

¶ 74    Foradas met with Associated in October 2002, where Associated offered $4 million, "$3.6 million and change for the environmental and toxic tort piece, and then they were prepared to pay us $350,000 roughly for a release of every other kind of claim Motorola could ever make under those insurance policies." At the October 2002 meeting, there was no discussion of any clean room type of claims asserted against Motorola. Although Foradas knew what clean room claims were at that point, he had never heard of clean room claims in reference to Motorola.

¶ 75    After the meeting, Associated and Motorola continued communicating. Foradas noted in an email to Billeter that while Motorola was preparing information that Associated had requested, "we weren't really interested in doing anything that included anything other than an environmental buyout and that's what I said." Foradas testified that the "environmental buyout" was "[a] buyout for all the pollution claims relating to the various plant sites and we would certainly consider the associated toxic tort claims that may come with those as they had proposed from the outset." Foradas testified that this environmental buyout "was our position throughout the negotiations" and Motorola never changed its position on that issue.

¶ 76    Foradas testified that he had explained to Associated that Motorola was not interested in a buyout of cell phone claims because "we simply couldn't value the other claims. *** [W]e simply weren't prepared to release what was pretty valuable insurance for claims that we couldn't value at this juncture."

¶ 77    Associated sent a proposed settlement agreement to Motorola which would have excluded asbestos claims from the scope of the release but would have released cell phone claims. Foradas and Campbell drafted a counterproposal leading into the next settlement meeting.

¶ 78    Motorola and Associated again met on March 19, 2003. Foradas, Massey, Wojdula, Milne, and Montgomery attended on behalf of Motorola, while Billeter, Gillespie, and several other individuals were present on behalf of Associated. Foradas did the bulk of Motorola's presentation and focused on Associated's financial analysis of the environmental claims; "[w]e focused solely on those claims. And the reason for that is identified in the next

- 16 -

bullet [of the presentation] which is we told them that while we understood what they would like to have, if they wanted to do a settle[ment], we weren't interested in a policy buyout or a release of even particularly asbestos and cell phone claims. And then we made clear what we were willing to do which was to grant them a full release for all past, current and future hazardous waste claims which were the environmental/toxic tort claims that we'd been discussing and were in the settlement drafts that had been exchanged."

¶ 79    Foradas testified that there was some discussion of what the term "full environmental buyout" meant, but that "[w]e didn't have to discuss it too much because we had been discussing it for some period of time, exchanged drafts, had defined that in the 'whereas' clauses as an environmental/toxic tort release. You know, we'd made it clear that's what we were interested in doing, we were prepared to essentially because we thought we could value and both parties thought they could value the various company pollution sites and the prospect of, you know, tort claims relating to them that we were prepared to release those kinds of claims." Motorola's position on the scope of a release it was willing to grant did not change during the meeting.

¶ 80    After further discussion, the parties agreed to settle for $6 million; the scope of the release was "[a] full environmental buyout, that is a buyout of all the environmental sites that–the pollution claims relating to those sites both sort of governmental cleanup claims and associated toxic tort property damage and bodily injury claims. And we agreed–and I believe our draft made clear because we thought it was a negotiating point that would give[ ] [Associated] some comfort, our draft provided for and we were prepared to essentially agree to release those whether they existed now or would come down the road in the future." At the March 19 meeting, there was no discussion of clean room claims and Foradas had not heard of any clean room claims against Motorola.

¶ 81    Foradas testified that after the meeting, Campbell (for Motorola) and Gillespie (for Associated) worked on drafting the release, and the release was executed in June 2003.

¶ 82    Foradas testified that after the agreement with Associated, Motorola turned back to Zurich. The parties had a second mediation session, and Foradas, Massey, Wojdula, Milne, and Montgomery were present on behalf of Motorola, while Pearson, Graber, and several other individuals were present on behalf of Zurich. Prior to the mediation, Motorola sent Zurich a copy of the Associated release because "we wanted the same deal to apply to both the insurance companies." In a letter attached to the Associated release, Foradas stated that "under the deal we have with [Associated], they paid Motorola 6 million for a comparable environmental release to the one that Mr. Pearson and I had just said we'd be interested in doing." At the mediation, the focus was on the dollar amounts at issue, since "we made clear in our correspondence that we were going to do the [Associated] deal, that that's what we wanted." The parties agreed to "[a]n environmental buyout like what we did with [Associated] for environmental pollution sites and associated toxic tort claims, and we agreed essentially–we agreed to walk away, no money would exchange hands." There was no discussion of clean room claims against Motorola, and Foradas was not aware of any clean room claims against Motorola at that point.

¶ 83                                    2. Kathleen Massey

¶ 84    Kathleen Massey testified that she was an in-house lawyer for Motorola until 2011, responsible for corporate litigation. Massey was involved with clean room matters

- 17 -

concerning Motorola, which began in approximately 2007 or 2008, years after the release at issue in the instant case. Massey was also involved in the Valley coverage litigation that resulted in the settlements with Associated and Zurich.

¶ 85 Massey testified that Motorola first attempted mediation with Zurich in 2002, but "[i]t was a complete failure," as the two were approximately $100 million apart. At that point, Foradas suggested that Motorola commence discussions with Associated. Motorola invited Associated to its offices in Schaumburg, and Associated made a presentation in which Associated indicated that it "wanted a complete policy buyout for their policies with Motorola." Motorola was not interested in such a buyout "at all." Instead, Motorola was willing to grant an environmental buyout. Motorola and Associated met a second time, and reached an agreement in which "[Associated] would pay Motorola $6 million and in exchange would be getting an environmental buyout from Motorola on its policies." After Motorola settled with Associated, it turned its attention to Zurich. Motorola provided Zurich with a "take-it-or-leave-it situation" in which Zurich would either agree to the same terms as Associated "or there was no deal."

¶ 86 On cross-examination, Massey testified that she did not have a specific recollection as to who spoke on behalf of Associated or Motorola at the March 19 meeting, nor did she have any notes or know of anyone at Motorola who took notes at the meeting. Massey further testified that she was unaware of any clean room cases against Motorola in 2003, despite the fact that a filing with the Securities and Exchange Commission concerning Motorola's spinning off its semiconductor business listed potential claims concerning " 'clean room environments' " as a " 'significant risk factor.' "

¶ 87 3. Thomas Campbell

¶ 88 Thomas Campbell testified that he was an attorney at Kirkland & Ellis in 2001 and worked on the Valley coverage litigation. His role in the litigation was "to support Mr. Foradas at Kirkland and really do whatever a junior partner would need to do for him." Campbell did not attend the October 2002 meeting between Motorola and Associated, but did assist in preparing a response to Associated's presentation at that meeting, which included working on Motorola's presentation for the March 19, 2003, meeting. Campbell did not attend the March 19 meeting, but Foradas informed him after the meeting that the parties had reached a deal and that Campbell was to put together the final agreement. Foradas informed Campbell that "the deal we were talking about was we were resolving coverage issues with [Associated] relating to the Valley litigation and other sites that we had identified for those types of claims. We weren't resolving the other stuff that [Associated] originally wanted us to resolve in their proposal." Campbell then exchanged a number of draft agreements with Gillespie, and the final settlement agreement was executed.

¶ 89 Campbell testified that one of the changes he suggested was to the definition of "environmental/toxic tort claims," because "we were trying to make changes to make sure that we were documenting the deal that had been struck, that we were building in language–and it's not just here, it's elsewhere as well–to make sure that what we were talking about was the Valley litigation and the Valley litigation type claims, the 52nd, 56th, 82nd Street. And so we were trying to make those types of distinctions clear."

D. Trial Court Ruling

¶ 91    On January 31, 2013, the trial court issued a written memorandum and judgment order in which it indicated that "[t]his cause came to be heard by the Court, sitting without a jury, to determine whether certain Releases entered into between Plaintiff and Defendants Associated Indemnity Corporation (a/k/a Fireman's Fund) and Zurich Insurance Company, separately, apply to a category of civil lawsuits referred to as 'clean room cases.' " The court stated:

> "The Court previously found the Releases to be ambiguous to the extent that the term 'environmental/toxic tort' (as defined therein) is susceptible to more than one reasonable interpretation when considering whether the Release applied to clean room cases. The Court has weighed and considered the testimony of the witnesses, judged their credibility by taking into account their manner and demeanor while testifying and, further, considered the reasonableness of their testimony in light of all the admissible evidence together with the exhibits offered and admitted into evidence. The Court did not consider any single utterance or document as definitive or conclusive. Reasonable inferences were drawn based on the totality of the evidence, testimonial and documentary, and all evidence was given appropriate weight and consideration in order to reach the instant judgment."

¶ 92    The court noted that "[a]t all times relevant, Plaintiff and Defendants [were] sophisticated entities represented by knowledgeable, competent attorneys and staffed with personnel experienced in the technicalities and complexities of both the manufacturing process employed by Plaintiff and the corresponding risks involved in insuring Plaintiff's business." The court further noted that the "fundamental subject matter giving rise to the execution of the Releases" was litigation referred to as the "Valley litigation," which involved claims against Motorola concerning contamination of landfills resulting in alleged bodily injury and property damage generally associated with groundwater contamination caused by toxic substances. The court found:

> "The Court finds each Defendant was motivated and desired to rid itself of any future liability under specific, known policies of insurance previously issued in favor of Plaintiff. Each sought a 'complete policy buyout'. Plaintiff was motivated to recover reimbursement and/or indemnification for its costs in the Valley and coverage litigation recognizing the risks involved in continued coverage litigation. Plaintiff did not agree to a 'full policy buy out' with either Defendant. Although it could comfortably evaluate its exposure to future 'Valley like litigation' it could not commercially evaluate or quantify its exposure to certain claims, including cell phones, asbestos and product liability claims. Through negotiation the parties agreed to 'carve out' from the Releases claims relating to cell phones, asbestos and product liability. All parties, Plaintiff and Defendants, were aware that IBM had been the subject of clean room claims starting in the [*sic*] mid-1990. No party discussed or negotiated the question of whether clean room type claims would or would not be included within the scope of either Release. The Court draws a reasonable inference that the failure to raise or discuss whether clean room cases were within the scope of either Release was either an oversight by one or all parties or it was an intentional decision not to bring the subject up in the course of the release negotiation process. There is no evidence from which the Court could reasonably conclude that a subject

that was not discussed was within the contemplation of any party at the time of negotiation or execution of either Release."

¶ 93     The court further noted:

"The Court concludes there were valid reasons not to raise the issue of whether clean room cases were within the scope of the Release. From the Defendants' perspective, millions of dollars had been spent and millions more might be spent dealing with the ongoing Valley coverage litigation. To raise the issue of clean room cases being released, when Motorola expressly stated it was unwilling to agree to release coverage for 'claims' it could not price, would surely eliminate the possibility [of] resolving the coverage litigation. Better to leave unknown, potential future claims relating to clean room cases for another day. From the Plaintiff's perspective, it had no known clean room claims, and to inject that issue into coverage litigation settlement discussions could possibly kill any reasonable chance of an acceptable resolution of its Valley and coverage claims thereby frustrating its goal of terminating all aspects of the Valley litigation. Better to leave unknown, potential future claims relating to clean room cases for another day. It was in the interest of all parties to fight the clean room claims at a later time, if ever."

¶ 94     The court ultimately concluded:

"Each Defendant knew which policy of insurance was involved in the Valley litigation and under which Plaintiff claimed coverage. Each party knew the limits of each policy and to what extent each policy was or would be impacted at the time of their negotiations and going forward. Although the Defendants may have desired a 'full policy buyout' Motorola never agreed to same. There is no persuasive testimony to support an inference or conclusion that Motorola would have agreed to a full policy buyout especially where it would not forego coverage for claims it could not reasonably anticipate or intelligently price. Given the sophistication of the Defendants, had it been the intention of the parties to forever terminate either Defendant's obligations under specific policies, either could have simply and directly stated in the Release a clear, definite provision listing each specific policy issued in favor of Plaintiff and the fact of termination thereof upon execution of the Release. This glaring omission supports the inference that there was no agreement or contemplation by the parties to include the clean room cases within the scope of either Release."

Accordingly, the trial court entered judgment in favor of Motorola on each defendant's affirmative defense and counterclaim concerning the applicability of the release.

¶ 95                                    VI. Posttrial Proceedings

¶ 96     On February 13, 2013, defendants filed a motion before Judge Margaret Brennan for a finding under Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010). On March 14, 2013, defendants also filed a motion to stay the proceedings pending resolution of an appeal on the release issue.

¶ 97     On April 12, 2013, Motorola filed a motion for summary judgment against defendants on the issue of whether defendants had a duty to defend Motorola in the clean room litigation

and also sought to stay litigation over coverage defenses pending a resolution of the clean room cases.

¶ 98    On May 6, 2013, the trial court granted defendants' motions and found that there was no just reason to delay enforcement of or appeal from the court's orders of April 13, 2012, December 10, 2012, and January 31, 2013, and also ordered that no further proceedings of any nature would take place pending the resolution of defendants' appeal. This appeal follows.

¶ 99                                      ANALYSIS

¶ 100    On appeal, defendants claim that the trial court erred in not granting summary judgment in their favor and erred in finding that the claims had not been released after a bench trial. Additionally, defendants claim that the trial court erred in denying their joint motion to compel discovery of the CRSP Notebook.

¶ 101                              I. Summary Judgment

¶ 102    Defendants first claim that the trial court erred in not granting summary judgment in their favor. Defendants argue that the trial court should have found the releases to be unambiguous, instead of finding them to be ambiguous as to the meaning of the term "environmental/toxic tort claims" and setting the issue for trial. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2010). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co*., 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 103    "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In other words, there is no evidence to support the plaintiff's complaint.

¶ 104    " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

- 21 -

¶ 105    A release " 'is the abandonment of a claim to the person against whom the claim exists.' " *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 21 (2003) (quoting *Hurd v. Wildman, Harrold, Allen & Dixon*, 303 Ill. App. 3d 84, 88 (1999)); *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 614 (2007). It is a contract and is therefore governed by contract law. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991) (citing *Polo National Bank v. Lester*, 183 Ill. App. 3d 411, 414 (1989)). Where a contract is clear and explicit, a court must enforce it as written, and the meaning of the contract, as well as the intention of the parties, must be gathered from the document without the assistance of extrinsic aids. *Rakowski v. Lucente*, 104 Ill. 2d 317 (1984); *Fuller Family*, 371 Ill. App. 3d at 614; *Shultz v. Delta-Rail Corp.*, 156 Ill. App. 3d 1, 10 (1987). However, if the language of the contract is susceptible to more than one meaning, it is ambiguous. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). If the contract language is ambiguous, a court can consider extrinsic evidence to determine the parties' intent. *Thompson*, 241 Ill. 2d at 441.

¶ 106    In the case at bar, the trial court found the term "environmental/toxic tort claim" to be ambiguous and set the matter for trial to determine whether the clean room cases were encompassed by the scope of the release. Defendants argue that the trial court should have granted their motions for summary judgment because the unambiguous language of the releases demonstrated that the clean room cases were released. Under the releases, "environmental/toxic tort claim" was a term that was defined to mean:

> "any past, present and future Claim involving Motorola, whether presently known, unknown or unknowable, involving actual, alleged, threatened or potential property damage (or injury to property or damage to natural resources including but not limited to 'NRD' or 'natural resource damages'), bodily injury (including sickness, disease, disability or death at any time resulting therefrom), mental injury, mental anguish, shock, emotional distress, fear of injury (including Claims seeking medical monitoring or damages for care and loss of services), personal injury and claims to recover clean-up or remediation costs (including but not limited to costs incurred and sums expended, or which may in the future be incurred or expended for investigation, removal, distribution, treatment or containment), involving actual, alleged, threatened or potential environmental pollution, environmental contamination or other injurious environmental conditions, including exposure to smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other environmental contaminants or pollutants, petroleum or natural gas or derivatives thereof, including without limitation, any hazardous waste as defined in 42 U.S.C. § 9601 or any substance regulated now or in the future by any government entity to protect human health or the environment from injury, damage or contamination."

Defendants claim that the clean room cases fall under "other injurious environmental conditions, including exposure to *** toxic chemicals, liquids or gases, *** including *** any substance regulated now or in the future by any government entity to protect human health or the environment from injury, damage or contamination." By contrast, Motorola argues that the injuries in the clean room cases do not involve "other injurious environmental conditions," because there was no release of a substance into the environment as would be present in a traditional environmental claim.

¶ 107    We agree with defendants that it is reasonable to interpret the releases to encompass clean room claims. However, we also agree with the trial court's conclusion that it is unclear whether the definition of "environmental/toxic tort claims" necessarily encompasses the clean room claims. Since the language is susceptible to more than one meaning, it is ambiguous. See *Thompson*, 241 Ill. 2d at 441. Accordingly, the trial court did not err in denying summary judgment.

¶ 108    Defendants' argument that the releases are unambiguous is based on: (1) dictionary definitions of the word "environmental"; (2) inclusion of "literally all government entities" (emphasis omitted) in the definition, thereby making clear the releases' broad scope; and (3) the carveouts present in the definition of "environmental/toxic tort claim." Defendants also claim that there is nothing in the releases limiting environmental claims to outdoor claims.

¶ 109    First, defendants point to several dictionary definitions that they claim support their reading of the term "environmental." To give words their plain, ordinary, and popular meanings, it is proper to consult a dictionary. See *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 436 (2010); *Valley Forge Insurance Co. v. Swiderski Electronics, Inc.*, 223 Ill. 2d 352, 366 (2006). Thus, defendants point to dictionary definitions indicating that "environment" is a broad term encompassing the general circumstances surrounding an individual. For instance, Merriam-Webster's dictionary defines "environment" as "the circumstances, objects, or conditions by which one is surrounded." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/environmental (last visited May 27, 2015). See also MacMillan Dictionary, http://www.macmillandictionary.com/us/dictionary/american/environment (last visited May 27, 2015) (defining "environment" as "the place in which people live and work, including all the physical conditions that affect them"). However, defendants' dictionary definitions are not the only definitions of the term "environment." For instance, MacMillan's dictionary also defines "environment" as "the natural world, including the land, water, air, plants, and animals, especially considered as something that is affected by human activity." MacMillan Dictionary, http://www.macmillandictionary.com/ us/dictionary/american/environment (last visited May 27, 2015). See also The American Heritage Dictionary of the English Language, https://www.ahdictionary.com/ word/search.html?q=environment (5th ed. 2014) (defining "environment" as "[t]he totality of the natural world, often excluding humans"). Thus, simply looking at dictionary definitions does not provide a clear answer as to whether the clean rooms were "environments" for purposes of the releases.

¶ 110    Defendants also argue that the releases' broad language indicates that clean room cases were covered. Defendants point to the releases' language that covered injuries due to exposure to "any substance regulated now or in the future by any government entity to protect human health or the environment from injury, damage or contamination." In its brief, Associated argues that "[t]he inclusion of literally *all government entities* reflects just how broad the Release was intended to be, and indicates, beyond question, that it encompasses chemical exposure claims involving substances regulated by OSHA to protect workers from harm in workplace environments, which of course the clean rooms were (and are)." (Emphasis in original.) However, as Motorola notes, the broad language of the release is limited by the requirement that the injury must involve "injurious environmental conditions." Thus, it would still be only exposure to a substance regulated by a government entity occurring in injurious environmental conditions that would be covered by the release. The

language cited by defendants does not shed any light on the meaning of the term "environmental" itself. If anything, it cuts against their argument, because a broad reading of "environmental" coupled with the inherent broadness of "any substance regulated now or in the future by any government entity" would result in the release of claims involving, in Motorola's words, "any type of exposure, anywhere, through any means." "[W]hen parties agree to and insert language into a contract, it is presumed that it was done purposefully, so that the language employed is to be given effect." *Thompson*, 241 Ill. 2d at 442. Thus, the term "environmental" must be some sort of limitation. At best, the broadness of the language remains unclear.

¶ 111    Finally, defendants point to the carveouts for asbestos, cell phones, and products liability as evidence that indoor claims are contemplated under the releases. The releases, in addition to the definition of "environmental/toxic tort claim" in subpart (i) of the definition, included two additional subparts providing:

"ii. 'Environmental/Toxic Tort Claim(s)' shall include Claims asserted under CERCLA, RCRA or equivalent state statutes or common law, whether at law or equity, and whether sounding in tort, contract, equity, nuisance, trespass, negligence or strict liability. 'Environmental/Toxic Tort Claim(s)' further includes, but is not limited to, demands for costs incurred and sums expended, or which may in the future be incurred or expended, for investigation, removal, distribution, treatment or containment of environmental contamination, or incurred in relation to environmental clean-up or remediation costs, whether known or unknown, including but not limited to Claims involving the properties or operations of Motorola.

iii. The term 'Environmental/Toxic Tort Claim' shall not include any past, present or future Claim or portion of any Claim against Motorola:

a. alleging or involving injury or damage caused or allegedly caused by or arising from a product sold by Motorola, a product containing materials sold by Motorola, or a product that contains component parts manufactured by Motorola, including but not limited to two-way radios, cellular telephones, or any product that utilizes or emits RF radiation, in which such injury or damage occurs or is alleged to have occurred after the product or component part has been sold by Motorola or after such product or component part has left Motorola's possession, custody, or control, and before the product has become a waste product or become part of a waste product; or

b. alleging or involving injury or damage caused or allegedly caused by, arising from or related in any way to asbestos or asbestos-containing materials."

Defendants specifically point to the carveouts of subpart (iii) to argue that the releases contained a broad reading of the term "environmental." They argue that the releases must encompass indoor claims because, otherwise, there would have been no need to carve out asbestos and cell phone claims, both of which involve indoor exposure.

¶ 112    "A court will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used." *Thompson*, 241 Ill. 2d at 442. Thus, defendants correctly note that there must be some meaning behind the inclusion of the carveouts, and their argument that the carveouts support a reading of the term "environmental" that would encompass indoor claims is a reasonable one. However, there is also a reasonable interpretation of the presence of the carveouts that

- 24 -

would not lead to defendants' desired result. As Motorola notes, subparts (ii) and (iii) can be read as examples of claims that are encompassed by the release and claims that are not encompassed by the release, respectively. Subpart (ii) makes clear that certain types of claims are encompassed by the release. Associated explains in its brief that at the time the releases were executed, "there was substantial litigation over how costs incurred in response to government demand letters/claims for equitable relief should be treated under insurance policies," and that "far from being meaningless or redundant, Section 1(B)(ii) clarified Section 1(B)(i), which made no specific reference at all to CERCLA, RCRA, or other such statutes, and the special issues they present." Thus, subpart (ii) took claims that may have otherwise been questionable, and expressly encompassed them under the release. Similarly, subpart (iii) can be read as taking claims that may have otherwise been questionable, and expressly excluded them from the release. In other words, while defendants' interpretation is reasonable, it is also reasonable to interpret subparts (ii) and (iii) as providing clarification on claims that may otherwise have been the source of disagreement between the parties. Thus, the presence of the carveouts does not resolve any ambiguity.

¶ 113   Pulling together all of their arguments, defendants additionally argue that nothing in the releases limits them to outdoor claims. However, at oral argument, Motorola made clear in no uncertain terms that the indoor/outdoor distinction is not at issue; instead, the issue is whether there was an environmental release. We agree with Motorola that the issue is not whether the claim was an indoor claim or an outdoor claim, but the issue instead is how broadly the term "environmental" is construed. That term controls the scope of the release and it is that term that is ambiguous.

¶ 114   Defendants also make several arguments concerning the specific reasoning of the trial court. However, "[d]e novo review is completely independent of the trial court's decision," and a reviewing court does not need to defer to the trial court's judgment or reasoning. *Platinum Partners Value Arbitrage Fund, Ltd. Partnership v. Chicago Board Options Exchange*, 2012 IL App (1st) 112903, ¶ 12. As demonstrated above, we have engaged in our own analysis of the releases' language and have come to the same conclusion as the trial court. Accordingly, we have no need to discuss the particular reasoning employed by the trial court.

¶ 115   In interpreting a contract, "a court initially looks to the language of a contract alone." *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). "If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Air Safety*, 185 Ill. 2d at 462. "If, however, the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present." *Air Safety*, 185 Ill. 2d at 462. In the case at bar, examining the language of the releases alone, the trial court determined that the definition of "environmental/toxic tort claim" was susceptible to more than one meaning and that the releases were ambiguous. After conducting a *de novo* review of the releases, we agree with the trial court that the releases were ambiguous and that the trial court properly denied defendants' motions for summary judgment and set the issue for trial.

¶ 116                                                    II. Trial

¶ 117   Defendants next argue that the trial court's finding that the release did not encompass the clean room claims was against the manifest weight of the evidence. Where ambiguity in a

contract exists, "the trial court's determination of the intent of the parties must not be disturbed on review unless it is contrary to the manifest weight of the evidence." *Bradley Real Estate Trust v. Dolan Associates Ltd.*, 266 Ill. App. 3d 709, 712 (1994). "A factual finding is against the manifest weight of the evidence if the opposite conclusion is plainly evident, or where the decision is unreasonable, arbitrary or without a basis in the evidence." *Asset Recovery Contracting, LLC v. Walsh Construction Co. of Illinois*, 2012 IL App (1st) 101226, ¶ 74.

¶ 118    "As the trier of fact, the trial judge was in a superior position to judge the credibility of the witnesses and determine the weight to be given to their testimony." *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008). In reviewing the trial court's findings, " '[i]t is not enough to show that there is sufficient evidence to support a contrary judgment.' " *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 142 (1986) (quoting *People ex rel. Lauth v. Wilmington Coal Co.*, 402 Ill. 161, 167 (1949)). Instead, "[w]hen contradictory testimony that could support conflicting conclusions is given at a bench trial, an appellate court will not disturb the trial court's factual findings based on that testimony unless a contrary finding is clearly apparent." *Chicago's Pizza*, 384 Ill. App. 3d at 859. "Even where [a party's] testimony in a bench trial was uncontradicted, the trial court was not required to give credence to or accept that testimony as establishing any fact in issue." *Gonet v. Chicago & North Western Transportation Co.*, 195 Ill. App. 3d 766, 776 (1990). "It is the trial court's prerogative to draw reasonable inferences and ultimate conclusions from the evidence [citation], and its judgment will not be disturbed because another trier of fact could have found differently or found reasonable other conclusions." *Gonet*, 195 Ill. App. 3d at 776. "The court will not upset determinations of facts, credibility of witnesses or weight to be given testimony unless those determinations are manifestly against the weight of the evidence." *Gonet*, 195 Ill. App. 3d at 776.

¶ 119    In the case at bar, although the releases they executed were substantively identical, Motorola engaged in very different negotiations with Associated and Zurich. Accordingly, we discuss each defendant separately for purposes of considering whether the trial court's factual findings concerning the parties' intent were against the manifest weight of the evidence.

¶ 120                                    A. Associated

¶ 121    Associated claims that the trial court's findings were against the manifest weight of the evidence (1) because the trial court based its decision on a factual finding that was not supported by the evidence and (2) because the trial court applied an inappropriate legal analysis and failed to resolve the issue before it.

¶ 122    Associated first claims that "the Trial Court premised its five paragraph decision entirely on a finding that both parties knew about the possibility for clean room claims against Motorola and, for reasons about which the Trial Court speculated, chose not to discuss them." We do not find this argument persuasive. The trial court's written opinion indicates that it found that "[a]ll parties, Plaintiff and Defendants, were aware that IBM had been the subject of clean room claims starting in the [*sic*] mid-1990." This fact is uncontroverted; Billeter, Associated's witness, testified that Shirley Shean, who participated in the Associated-Motorola negotiations, handled clean room cases for IBM at the time of the execution of the release. From this fact, the trial court arguably inferred that the parties

- 26 -

would have been aware of the possibility that such claims would also affect Motorola. "It is the trial court's prerogative to draw reasonable inferences" (*Gonet*, 195 Ill. App. 3d at 776), and we cannot find that the trial court's inference here, if one was made at all, was unreasonable. IBM was a competitor of Motorola engaged in the same type of business, and it was reasonable for the trial court to infer that Associated would have been aware of the possibility that Motorola would face the same kinds of liability claims as IBM had. We cannot find that this would render the trial court's decision against the manifest weight of the evidence.

¶ 123    Associated also argues that the trial court applied the wrong legal analysis because it focused on whether the clean room cases were within the parties' contemplation instead of determining whether the definition of "environmental/toxic tort claim" encompassed the interior of Motorola's workplace. Associated argues that "a particular claim need not have been specifically contemplated or discussed by the parties to be encompassed by the release; rather[,] it need only fall within one of the categories that were contemplated by the parties." We do not find this argument persuasive.

¶ 124    In support of its argument, Associated relies on our decision in *Goodman v. Hanson*, 408 Ill. App. 3d 285 (2011). In that case, we considered the issue of "whether unknown claims that fall within the specific terms of a general release are barred by the release." *Goodman*, 408 Ill. App. 3d at 294. The release in that case barred " 'any and all claims and matters that have been asserted in the Litigation or that could have been asserted in the Litigation, and any and all claims arising out of or in any way related to the obligations, duties and management or administration of the Estate and/or Trust.' " *Goodman*, 408 Ill. App. 3d at 289. The question presented to us was whether a malpractice claim based on the defendant's failure to take certain deductions in a federal estate tax return was barred by the release. *Goodman*, 408 Ill. App. 3d at 288-89. After conducting an analysis of the relevant case law, we concluded that the claim was barred by the release, noting that "although the parties may not have contemplated claims specifically based on the Federal return, the terms of the release indicate that they contemplated (1) there were matters that were not asserted in the first lawsuit that could have been and (2) claims related to the 'obligations, duties and management or administration of the Estate and/or Trust.' Both of these categories include the claims based on the Federal return, and accordingly, those claims are barred." *Goodman*, 408 Ill. App. 3d at 297.

¶ 125    *Goodman* is inapposite to the instant case. As noted, in that case, there was no question that the claims asserted fell within the terms of the release. The only question was whether the fact that they were unknown at the time of the release's execution had any effect on the applicability of the release. Here, by contrast, the question that the trial court had to resolve was whether the clean room cases fell within the definition of "environmental/toxic tort claims." The trial court concluded that they did not, based on the parties' negotiation history.

¶ 126    While it would have been equally proper for the trial court to have stated the question more broadly, we can find no error in its choosing to limit its holding to answering the narrow question presented by the facts before it: whether the clean room cases in particular were covered by the release. The trial court expressly stated that it "weighed and considered the testimony of the witnesses, judged their credibility by taking into account their manner and demeanor while testifying and, further, considered the reasonableness of their testimony in light of all the admissible evidence together with the exhibits offered and admitted into

evidence." It also referenced the parties' negotiation history in its analysis, specifically noting that Associated was seeking a full policy buyout while Motorola was unwilling to release cell phone, asbestos, or product liability claims because it could not quantify its exposure. We cannot find that the trial court's conclusion that the clean room cases were not encompassed by the release to be "unreasonable, arbitrary or without a basis in the evidence" (*Asset Recovery Contracting, LLC*, 2012 IL App (1st) 101226, ¶ 74), and, accordingly, affirm the trial court's judgment in favor of Motorola.

¶ 127                                     B. Zurich

¶ 128    In addition to some of the same arguments raised by Associated, which we will not repeat here, Zurich argues that the trial court's finding was against the manifest weight of the evidence because (1) the trial court ignored evidence that the Valley litigation resolved claims involving indoor exposures, (2) the trial court ignored evidence of Motorola's and Zurich's course of dealings on the intended meaning of the term "environmental," and (3) the trial court disregarded evidence that Motorola itself treated clean room claims as environmental claims.

¶ 129    As an initial matter, as noted, Zurich's arguments are based on the trial court "ignor[ing]" or "disregard[ing]" certain evidence. However, all of the evidence that Zurich points to was presented during the bench trial, and the court's opinion expressly stated that it "weighed and considered the testimony of the witnesses, judged their credibility by taking into account their manner and demeanor while testifying and, further, considered the reasonableness of their testimony in light of all the admissible evidence together with the exhibits offered and admitted into evidence." The fact that the trial court did not expressly mention the pieces of evidence Zurich cites does not mean that the trial court did not consider it.

¶ 130    Zurich first argues that the trial court's order "fails even to acknowledge the evidence admitted at trial that the Valley Litigation involved both indoor and outdoor environment exposures." However, as noted, the relevant question was not whether the release encompassed both indoor and outdoor claims since, as Zurich notes, it is undisputed that several of the Valley cases involved claims of drinking contaminated groundwater inside the plaintiffs' homes. Instead, the question was whether Motorola's clean rooms constituted "environments" under the release. Thus, Zurich's argument offers no support to its claim that the trial court's decision was against the manifest weight of the evidence.

¶ 131    Next, Zurich argues that the trial court ignored the unimpeached evidence at trial that Motorola knew that Zurich treated the Valley litigation, cell phone suits, and asbestos suits as environmental claims under the purview of its environmental claims unit. However, as Motorola notes, the trial court was entitled to give Zurich's internal organizational nomenclature little weight in the context of interpreting the Zurich release, and we will not reweigh the evidence. Moreover, "[e]ven where [a party's] testimony in a bench trial [is] uncontradicted, the trial court [is] not required to give credence to or accept that testimony as establishing any fact in issue." *Gonet*, 195 Ill. App. 3d at 776. We cannot find that the trial court's failure to mention this fact renders its decision against the manifest weight of the evidence.

¶ 132    We also note that this was not the only evidence of the course of dealings between Motorola and Zurich. Instead, there was also evidence of the parties' negotiations leading to the execution of the release. Pearson, who represented Zurich, testified that for the second

- 28 -

mediation session in November 2003, Zurich requested a release concerning the Valley sites and 56 related sites. Motorola suggested a release also concerning the Valley sites and 56 related sites, but with an exception for asbestos and cell phone claims. Motorola also provided Zurich a copy of the Associated release, which Pearson considered to be "much broader" in scope; however, Pearson did not discuss his interpretation with anyone at Motorola. Instead, in a letter attached to the Associated release, Foradas, on behalf of Motorola, stated that "under the deal we have with [Associated], they paid Motorola 6 million for a comparable environmental release to the one that Mr. Pearson and I had just said we'd be interested in doing." Thus, Zurich was informed that Motorola considered the Associated release to be a "comparable environmental release" to the scope of release that Pearson and Foradas had been discussing. The scope of the release was not discussed further between the parties, with the only negotiation being over the dollar amounts at issue.

¶ 133    Finally, Zurich argues that the trial court ignored evidence that Motorola itself considered clean room claims to be environmental claims. However, again, the trial court was permitted to give little weight to Motorola's use of the term in various contexts in light of the language of the release and the negotiating history between the parties. Furthermore, there is no indication that Zurich was aware of Motorola's use of the term. As Zurich itself points out, "[o]nly the overt acts of the parties and the communications between them may be considered in determining whether and upon what terms they have entered into a contract." *American College of Surgeons v. Lumbermens Mutual Casualty Co.*, 142 Ill. App. 3d 680, 693 (1986). See also *Carey v. Richards Building Supply Co.*, 367 Ill. App. 3d 724, 727 (2006) ("undisclosed intentions are not relevant"). Accordingly, we cannot find that the trial court's finding that the clean room cases were not encompassed by the Zurich release to be against the manifest weight of the evidence and affirm the judgment of the trial court.

¶ 134                              III. Motion to Compel

¶ 135    Finally, defendants argue that the trial court erred in denying their motion to compel discovery of the CRSP Notebook. As part of discovery, defendants filed a motion to compel the production of a document entitled the "CRSP Reference Notebook (Environmental)," which they claimed would be relevant to show that Motorola considered clean room claims to be "environmental." The document was allegedly a compilation of memoranda drafted by a number of environmental and toxic tort attorneys working under Motorola's environmental, health, and safety group beginning in 1996, concerning a defense strategy for anticipated litigation over environmental chemical exposure in Motorola's clean rooms after IBM, a competitor of Motorola, had been sued for injuries and birth defects to children of employees and contractors who worked in IBM's clean room facilities. Motorola refused to produce the documents, arguing that the attorney-client privilege and work product doctrine applied. On November 28, 2012, the trial court ordered Motorola to produce the notebook to the court for *in camera* review, after which the court would "rule on whether the CRSP Notebook is relevant."

¶ 136    On December 10, 2012, at the beginning of trial, the trial court ruled on defendants' motion to compel production of the CRSP notebook. The court stated:

    "On the first topic with respect to the motion to compel, I reviewed the compilation of documents that are referred to as the CRSP notebook which is the Clean Room Safety Program notebook.

The defendants moved to have the notebook[,] I'll refer to it as[,] produced in discovery. The plaintiff objected on the grounds of attorney-client privilege and work product, attorney work product privilege.

The Court is going–and I did review the manual. I find it to be privileged information both as far as attorney-client matters and as to–and also that it is perhaps also work product information.

Additionally, I'm ruling that it's not relevant to the issue before the Court today which is why we are here, and that is to determine what the phrase 'environmental toxic tort' means as used in the two releases in question in this declaratory action proceeding.

I don't think work product or attorney-client information that was generated at least several years prior to the execution of this release is relevant to the Court's inquiry as to what the parties intended, what the parties meant and what they agreed to with respect to the term 'environmental toxic tort' in the context of the circumstances surrounding the execution of the questioned releases. So with that, that's the ruling on the motion to compel.

Now, that is not to say that a different ruling might–and I emphasize 'might'–be appropriate if this were an underlying declaratory judgment action on the issue of whether there was either a duty to defend or a duty to indemnify.

I know ultimately, that's the bone of contention between the parties, but at this juncture, the issue is what did the release that was executed in 2003 mean, what did the parties want it to mean and what did they bargain for and what did they get when they wrote it down and signed it."

¶ 137　On appeal, defendants argue that the trial court's denial of their motion to compel was legally erroneous and prejudicial. Defendants argue that (1) the trial court did not apply the correct standard for relevance and (2) the notebook fell within the proper scope of discovery. Defendants also argue that the trial court erred in finding the documents shielded by the attorney-client privilege and the work product doctrine. We do not find these arguments persuasive.

¶ 138　Defendants first argue that the trial court erred by applying the standard for relevance for admissible evidence, as opposed to the standard for relevance for discovery. Illinois Supreme Court Rule 201(b)(1) (eff. July 1, 2002) authorizes broad discovery "regarding any matter relevant to the subject matter involved in the pending action." "Traditionally, the trial court is accorded great latitude in determining the scope of discovery, as discovery presupposes a range of relevance and materiality which includes not only what is admissible at trial, but also that which leads to what is admissible at trial." *D.C. v. S.A.*, 178 Ill. 2d 551, 561 (1997). A trial court's rulings on discovery matters "will not be disturbed on appeal absent a manifest abuse of discretion." *Reda v. Advocate Health Care*, 199 Ill. 2d 47, 54 (2002). A court abuses its discretion "when its ruling 'is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *Taylor v. County of Cook*, 2011 IL App (1st) 093085, ¶ 23 (quoting *People v. Caffey*, 205 Ill. 2d 52, 89 (2001)). This standard of review is "highly deferential" to the trial court. *Taylor*, 2011 IL App (1st) 093085, ¶ 23.

¶ 139　In the case at bar, there is no evidence that the trial court failed to apply the standard for relevance in discovery matters. The court made it clear that the CRSP Notebook was sought

to be produced in discovery, and the court found it not to be relevant after an *in camera* review. We will not presume that the trial court applied the wrong standard in the absence of any evidence that it did so.

¶ 140 Furthermore, we cannot find that the trial court abused its discretion in denying defendants' motion to compel. Defendants argue that the notebook demonstrated that Motorola's own environmental, health, and safety group considered clean room claims to be environmental claims. Zurich additionally argues that "[w]hat Motorola knew about the clean room risk at the time of settlement, how it treated that risk as environmental, and why it did not carve out those claims is essential evidence and, thus, is relevant." However, with respect to Zurich's point, there is no indication that any of these documents would have shed light on Motorola's knowledge at the time of settlement, as they were compiled prior to the settlement negotiations; the trial court also found that Motorola knew of the possibility of clean room claims, so the notebook would not add anything to that aspect. Additionally, as noted, Motorola's internal characterization of clean room claims several years before entering into settlement negotiations with either defendant is not relevant to the issue of whether those claims were released because there is no indication that this characterization was ever shared with defendants. "[T]he pertinent inquiry [in interpreting a contract] focuses upon the objective manifestations of the parties, including the language they used in the contract." *Carey*, 367 Ill. App. 3d at 727. Thus, "undisclosed intentions are not relevant." *Carey*, 367 Ill. App. 3d at 727. The relevant information for interpreting the scope of the releases was the negotiations between the parties and the information shared between them. We cannot find the trial court abused its discretion by denying defendants' motion to compel.

¶ 141 Moreover, we note that the trial court had the opportunity to review the notebook *in camera* prior to its ruling on the motion to compel. Thus, the court had the opportunity to examine whether the documents contained in the notebook were relevant or would lead to relevant information. Armed with this additional knowledge of the contents of the documents defendants sought to discover, we cannot find that the trial court's determination that these documents were not relevant was an abuse of discretion.

¶ 142 Since we have determined that the trial court did not abuse its discretion in denying defendants' motion to compel on the basis of relevance, we have no need to consider whether the documents were also shielded from discovery by the attorney-client privilege and the work product doctrine.

¶ 143 CONCLUSION

¶ 144 For the reasons set forth above, we find that: (1) the trial court did not err in denying defendants' motions for summary judgment and finding the releases to be ambiguous; (2) the trial court's finding that the releases did not encompass clean room claims was not against the manifest weight of the evidence; and (3) the trial court did not abuse its discretion in denying defendants' motion to compel the production of the CRSP Notebook.

¶ 145 Affirmed.