2024 IL App (1st) 230629

SIXTH DIVISION
December 27, 2024

No. 1-23-0629

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF AMANDA ALPERT KNIGHT, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Cook County |
| | ) | |
| and | ) | No. 15 D 3408 |
| | ) | |
| ROBERT GREENWELL KNIGHT III, | ) | The Honorable |
| | ) | Robert Johnson, |
| Respondent-Appellee. | ) | Judge Presiding. |

PRESIDING JUSTICE TAILOR delivered the judgment of the court, with opinion. Justices Hyman and Gamrath concurred in the judgment and opinion.

**OPINION**

¶ 1    At issue is whether a modification of child support may be warranted where the obligor parent enjoys a substantial growth in income such that the children now enjoy a much higher standard of living with him than they do when they are with the obligee parent. We hold that under the facts of this case, the circuit court erred by finding that there was no substantial change in circumstances. Accordingly, we reverse and remand for further proceedings consistent with this opinion.

¶ 2                                    I. BACKGROUND

¶ 3    Robert Knight (Robert) and Amanda Alpert Knight (Amanda) were married on March 19, 2005. Before they married, they entered into a premarital agreement stating, *inter alia*, that the

property and assets they acquired in their respective names prior to their anticipated marriage would remain their separate, nonmarital property. As it relates to the present dispute, Robert was the beneficiary of certain valuable family trusts, which, pursuant to the premarital agreement, would remain his nonmarital property after the marriage.

¶ 4     Robert and Amanda had two children, A.K. and T.K., during the marriage. On April 14, 2015, Amanda filed a petition for dissolution of marriage. Amanda and Robert had negotiated a marital settlement agreement (MSA) employing a cooperative law process, which was then incorporated into the judgment of dissolution of marriage (Judgment) entered two weeks later, on April 27, 2015. Attached to the MSA is an exhibit valuing Robert's various assets at approximately $40 million, including three nonmarital family trusts valued at over $37 million and real estate.

¶ 5     In relation to child support and related expenses, section 4 of the MSA, in relevant part, states:

> "*4.1 Child Support.*  Robert shall pay Amanda child support in the amount of Ten Thousand Dollars ($10,000) per month[.]
>
> * * *
>
> The parties' respective obligations to provide for the support of the children and pay child support (including certain of the child- related expenses as provided in Section 4.2) shall terminate upon the emancipation of both children. For purposes of this Agreement, a child shall be deemed to be emancipated upon his reaching age eighteen (18), graduation from high school, marriage, death, or entry into the armed services; provided that if the child is still attending high school and is actively enrolled and seeking a high school diploma upon reaching age eighteen (18), then the child shall be deemed emancipated  upon the child's graduation from high school, or attaining the age of

nineteen (19), whichever first occurs.

*4.1.3 Deviation from Statutory Guidelines.* Robert and Amanda agree that child support pursuant to the guidelines contained in Section 505 of the Illinois Marriage and Dissolution of Marriage Act ("IMDMA") (750 ILCS 5/505) is not appropriate in light of the parties' respective incomes, the children's reasonable needs, the standard of living that the children would have enjoyed had the marriage continued, the other financial provisions contained in this Agreement, and other relevant factors. The parties acknowledge that Robert's annual gross income ranges from Six Hundred Thousand Dollars ($600,000) to One Million Six Hundred Thousand Dollars ($1,600,000) (and potentially more for 2015 only attributable to capital gains incurred for liquidation of securities needed for the funding of this settlement); and that Amanda's annual gross income ranges from Sixty Thousand Dollars ($60,000) to One Hundred Sixty Thousand Dollars ($160,000) (not including maintenance received).

\* \* \*

*4.2 Payment of Child-Related Expenses.* Amanda and Robert shall contribute to the payment of child-related expenses as follows:

4.2.1 Robert shall pay one hundred percent (100%) of the insurance premiums for health insurance policies covering each child, together with all uninsured medical, dental, optical, orthodontia, psychological and psychiatric expenses for each child (excluding over-the-counter items), until each graduates college or attains age 23, whichever first occurs;

\* \* \*

Robert shall pay one hundred percent (100%) of each child's educational

expenses as charged or required by the school, including, but not limited to, school registration fees, tuition (including for preschool), school enrichment programs, school lunches, books, and field trips, and any other educational expenses as agreed between the parties before the expense is incurred, until the child completes high school (but not beyond the child's attaining age 19).

4.2.3 Robert shall pay seventy-five percent (75%) and Amanda shall pay twenty-five percent (25%) of the following expenses for each child: (i) all child care expenses during work hours away from the children, (ii) expenses for extracurricular activities and clubs as charged or required by the activity or club or as agreed between the parties, (iii) camp expenses as charged or required by the camp or as agreed between the parties, all as agreed between the parties before the expense is incurred, until the child completes high school (but not beyond the child's attaining age 19).

* * *

4.2.5 Except as otherwise specifically provided herein, each party shall be solely responsible for the payment of the everyday living expenses of the children, such as food[,] shelter, and entertainment, and any expenses that he or she respectively incurs for the children, while the children or either of them, are residing with or in that party's care or control; * * * . In light of the above support provisions, Amanda shall be solely responsible for payment of the children's expenses except as otherwise provided herein."

¶ 6 Section 12.6 of the MSA also imposed an obligation on Robert and Amanda to annually confirm that their income remains within the range specified in the MSA:

"In the future, neither party shall be obligated to provide his or her separate income tax returns to other party for any reason, except as may be ordered in litigation or pursuant

to court rules. Each party shall request that his or her tax preparer provide the other party with a written statement confirming whether his or her annual gross income for the previous tax year was within the range of annual gross income for him or her referred to in Section 4.1.3 above, and shall provide the statement with seven (7) days of filing his or her federal income tax returns for the previous tax year until both children are emancipated."

¶ 7    Under the MSA, Amanda received marital estate assets valued at $1,225,188, including a home valued at $955,000. The MSA also provided that Amanda would receive "non-modifiable" maintenance of $4000 monthly until 2032.

¶ 8    On November 4, 2021, Amanda filed the instant motion to modify child support, alleging that since the Judgment was entered in 2015, Robert's income and net worth had increased substantially and that he and the children were enjoying a substantially enhanced standard of living. She sought to increase Robert's child support obligation from $10,000 to $25,000 per month and his childcare, extracurricular, and camp expense obligations from 75% to 100% of the total cost. Amanda attached two financial affidavits and a worksheet to her motion to modify. She averred that her monthly income was approximately $16,000 and monthly expenses were approximately $43,000, including "Gym & Club Membership dues" of $3000. She also anticipated her monthly expenses for vacations and a higher-end vehicle would be $7000 and $2500, respectively. She claimed these anticipated expenses were meant to help her approximate and provide A.K. and T.K. the standard of living they enjoy when they are with Robert. Amanda also stated that she incurred approximately $3500 in monthly expenses to provide for the children when she had parenting time with them. Amanda further included a $5000 estimate for the cost of needed

repairs and maintenance for her home; this did not include the estimates that her experts provided for the cost of other needed repairs and maintenance.

¶ 9    Amanda served Robert with a request for production of documents. In response, Robert stated that he:

"formally admits that he has the financial ability to pay all reasonable shown increased needs of the minor children. Based on this admission, the excessive discovery regarding [Robert's] assets and income is wholly irrelevant and, [sic] [Robert] objects to having to produce any documents sought in the Request to Produce which do not reflect the expenses and needs of the minor children."

Robert produced his 2019, 2020, and 2021 tax returns, 18 months of checking account statements, account statements from the line of credit he used to purchase his new residence, and 18 months of credit card statements reflecting his payment of the children's expenses. However, Robert did not produce documents responsive to Amanda's following request:

"For all trusts of which Robert is a settlor, beneficiary or trustee provide:

A.  Copies of all trust agreements or declarations of trust and all amendments thereto

B.  Trust federal income tax returns

C.  Copies of documents reflecting the corpus of the trusts and the current value

D.  General ledger

E.  All deposits and withdrawal receipts, account statements, canceled checks, and check registers for all accounts of any type, including without limitation, savings accounts, checking accounts, certificate of deposit, money market funds, brokerage or securities accounts, or investment accounts of any type."

In a September 15, 2022, order, the circuit court, on its own motion, limited this request to "trusts in which the children are beneficiaries." According to Amanda, this prevented her from reviewing documents related to Robert's revocable trust, his most valuable asset by far. Amanda then moved to vacate the court's discovery ruling or, in the alternative, to bar Robert from asserting a defense based on his financial inability to pay child support. The court denied Amanda's motion in both respects. We have no record of the court's reasoning, but as we explain below, at the evidentiary hearing on Amanda's motion to modify, the court ruled that Robert would not be permitted to claim inability to pay additional child support, and Robert's counsel confirmed at oral argument that Robert would not defend on that basis.

¶ 10    On November 3, 2022, Robert filed a motion *in limine* to bar Amanda's two expert witnesses from testifying about repairs and updates needed for her home and the estimated costs. Relying on *In re Keon C.*, 344 Ill. App. 3d 1137, 1142 (2003), Amanda responded that "[a] child is not expected to have to live at a minimal level of comfort while the noncustodial parent is living a life of luxury." On December 2, 2022, the circuit court granted Robert's motion, reasoning that the testimony and opinions the experts intended to offer were "not relevant" to the hearing on the motion to modify.

¶ 11    The circuit court conducted an evidentiary hearing on the motion to modify on December 19, 2022. We summarize only those parts of the record relevant to the disposition of this appeal.

¶ 12    Robert was called as an adverse witness. Robert testified that when the Judgment was entered, his assets were worth approximately $40 million, including, but not limited to, family trust assets he controlled and of which he was a beneficiary. According to an exhibit Robert prepared in anticipation of the hearing on the motion to modify, at the time of the Judgment was entered, the value of the Robert Greenwald Knight III Revocable Trust was $28,886,996; the value

of the Knight Family Trust, of which he was a beneficiary, was $6,945,517; and the value of the Knight Trust, of which he was beneficiary, was $1,687,714. By the time of the hearing on the motion to modify, the combined value of Robert's assets had increased to approximately $48 million; however, Robert claimed that some of these trust assets should not be considered his. For our purposes, however, the value of Robert's trust assets is irrelevant because Robert conceded that he could pay whatever reasonable amount of child support the court ordered.

¶ 13 Robert testified that he has been employed as an engineer for most of his professional career, earning approximately $120,000 per year at the time of the hearing. When the MSA was executed, he earned $90,000 per year. Robert paid his living expenses from his salary, dividends on investments, and the proceeds of the sale of trust assets. Robert had a line of credit to pay for larger purchases, such as his new home. According to Robert's 2020 and 2021 federal income tax returns, his total income was $2,018,048 and $3,641,757, respectively, substantially above the ranges specified in the MSA. In 2020, Robert's dividend income was $584,484, and his capital gains income was $1,195,379. In 2021, Robert's dividend income was $574,211, and his capital gains income was $2,934,372.

¶ 14 Robert testified that he married Ellen Knight in 2017. From 2017 to 2021, Robert and Ellen lived in Robert and Amanda's former marital home in Northfield, which Robert and Amanda had built at a cost of $6.2 million. In 2021, after approximately four years of living at the former marital home with Ellen, A.K., T.K., and Ellen's children, Robert purchased a large property in Kenilworth for $9.45 million to accommodate his new, larger family. The home was newly built, but Robert and his family chose the finishings. All four children have their own bedroom, and each room has its own bathroom. The Kenilworth home fronts Lake Michigan and has an outdoor pool,

an indoor sports center including a gym, and a home theater. The former marital home had none of these amenities.

¶ 15    Robert testified that he took A.K. and T.K. on vacations to Las Vegas, Virginia, Naples, and the Bahamas between 2019 and 2022. They took a private jet to the Bahamas in 2021, and that vacation alone cost $135,000.

¶ 16    Amanda testified that, in 2021, she left her employment with The Association of American Educators, where she was paid $95,000 per year. She then started her own college admission counseling business, which, at the time of the hearing, was in the early stages of development and generating minimal income. Amanda lived in a home in Northfield that Robert had purchased for $955,000 as part of the MSA. Amanda then obtained a mortgage on the property and used the loan proceeds to open an investment account, which was valued at approximately $1 million at the time of the hearing.

¶ 17    Amanda testified at length about the repairs she had already performed on her home. She also testified that additional repairs and updates were needed to raise and approximate the standard of her home to what A.K. and T.K. enjoy when they are with Robert. Amanda testified that her patio contained holes and the stairs were rotting, some of the windows showed damage from rot and water, and the children's bathrooms required updating.

¶ 18    On February 21, 2023, the circuit court entered an order denying Amanda's motion to modify, stating, without further explanation:

> "1. Amanda has failed to demonstrate a substantial change in circumstances that was uncontemplated by either of the parties prior to the entry of the Judgment for Dissolution of Marriage.

9

2. Amanda has failed to establish that there has been an increase in the needs of the children that warrants an increase in child support and/or a modification to child-related expenses."

¶ 19    Amanda then filed a petition for contribution to attorney fees and costs. Amanda had already paid her attorneys $110,001 in fees and owed an additional $106,809. On April 3, 2023, the circuit court denied Amanda's petition, stating, "Amanda has not shown, after consideration of all relevant factors, that requiring her to pay the entirety of her legal fees would undermine her financial stability."

¶ 20    Amanda timely filed a notice of appeal.

¶ 21                                    II. ANALYSIS

¶ 22    Amanda raises four issues on appeal. First, she challenges the circuit court's orders denying her discovery requests related to Robert's trust assets. Second, she contends that the circuit court erred in finding that she did not show a substantial change in circumstances warranting a modification of child support. Third, she contends the circuit court erred in barring her expert witnesses. Finally, she contends that the circuit court erred in denying her petition for attorney fees. Robert contends that Amanda's motion for additional child support is a thinly veiled request to enhance her own lifestyle, which the court may not do because the parties agreed in the MSA that her monthly maintenance of $4000 is nonmodifiable.

¶ 23    To inform our analysis of each of these issues, we begin with section 510 of the Illinois Marriage and Dissolution of Marriage Act (Act), which states that "[a]n order for child support may be modified as follows: (1) upon a showing of a substantial change in circumstances." 750 ILCS 5/510 (West 2020). Section 510 of the Act was recently amended. Prior to the amendment, an increase in income would not constitute a substantial change in circumstances if "the increase

was based on events that were contemplated and expected by the trial court when the judgment *** was entered." (Internal quotation marks omitted.) *In re Marriage of Durdov*, 2021 IL App (1st) 191811, ¶ 22; *In re Marriage of Salvatore*, 2019 IL App (2d) 180425, ¶ 24 ("[A] substantial change in circumstances will not be found when the parties' present circumstances were contemplated when they entered their agreement."). In 2022, after the motion to modify was filed, section 510 was amended to state:

> "Contemplation or foreseeability of future events shall not be considered as a factor or used as a defense in determining whether a substantial change in circumstances is shown, unless the future event is expressly specified in the court's order or the agreement of the parties incorporated into a court order. The parties may expressly specify in the agreement incorporated into a court order or the court may expressly specify in the order that the occurrence of a specific future event is contemplated and will not constitute a substantial change in circumstances to warrant modification of the order[.]" 750 ILCS 5/510 (West 2022).

¶ 24 Section 801 of the Act provides that the "Act applies to all proceedings commenced after its effective date for the modification of a judgment or order entered prior to the effective date of this Act." 750 ILCS 5/801(c) (West 2020). Although section 801 references the Act's application in general, courts have held that section 801 also applies to amendments to the Act. See, *e.g.*, *In re Marriage of Benink*, 2018 IL App (2d) 170175, ¶¶ 26-27 (amended Act only applies to motions to modify filed after its effective date); *In re Marriage of Brown*, 127 Ill. App. 3d 831, 835 (1984) ("we believe that the application of section 801 to the amendment in question here is both reasonable and appropriate"); *In re Marriage of Sweet*, 119 Ill. App. 3d 1033, 1040 (1983)

11

("Although section 801(d) is addressed to the Act itself, in our judgment it should be applied to amendments as well.").

¶ 25    Specific to section 801(c) and motions to modify, we have previously found that amendments to the Act apply to motions to modify filed after the effective date of the amendment. See *In re Parentage of A.H.*, 2023 IL App (1st) 190572, ¶ 83; see also *In re Marriage of Micheli*, 2022 IL App (2d) 200704-U, ¶ 51 (noting the "settled understanding that section 801(c) dynamically applies to all *** amendments" of the Act). The same reasoning applies to the May 13, 2022, amendment to Section 510. See, *e.g.*, *In re Marriage of Svec*, 2024 IL App (2d) 220461-U, ¶¶ 27-28 (the May 13, 2022, amendment to section 510 did not apply to a motion to modify filed before its effective date); *In re Marriage of Otero*, 2023 IL App (1st) 211452-U, ¶ 30 ("Without any language accompanying the May 13, 2022 amendment in question to indicate which amendment or portion of the statute that particular amendment should apply to, the Section 801 language applicable to the entire act applies to the 2022 amendment as well."). Because Amanda's motion to modify was filed before section 510 was amended, the prior version of section 510 applies here. Thus, when determining whether there has been a substantial change in circumstances warranting a modification of child support, we look to whether Robert's increase in income was contemplated by the circuit court and parties when the Judgment was entered. Having determined which version of section 510 of the Act applies, we turn now to the specific issues raised by Amanda.

¶ 26    A. The Circuit Court Did Not Abuse Its Discretion in Limiting Amanda's Discovery

Related to Robert's Trust Assets

¶ 27    Amanda challenges the circuit court's denial of her request for documents related to Robert's trust assets. We will not disturb the circuit court's rulings on discovery matters absent a

manifest abuse of discretion. *Motorola Solutions, Inc. v. Zurich Insurance Co.*, 2015 IL App (1st) 131529, ¶ 138. A court abuses its discretion when its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the court. *Id.*

¶ 28    We find the circuit court did not abuse its discretion by limiting Amanda's trust related discovery requests. Although trust agreements, trust income tax returns, trust general ledgers, and all other trust account records could be relevant in a proceeding to modify child support, in this case, these documents would not have provided Amanda with any additional factual basis to establish a substantial change in circumstances warranting a modification of child support. As the circuit court noted, Robert admitted that he could pay whatever reasonable amount in support the circuit court ordered, so whether he had sufficient assets to pay additional child support was not at issue. The circuit court held Robert to his admission, stating immediately before the evidentiary hearing: "I won't allow him to testify *** to the idea that he has an inability to pay ***." Robert's counsel then confirmed Robert's admission that he had the ability to pay, irrespective of any limitations under his trusts:

> "Court: I am holding them to their agreement. He has the ability to pay anything that I order. And I will not allow him to testify otherwise. *** [E]ven if there were limitations on the trust, that doesn't limit his ability to pay anything I order, correct.
>
> [Robert's Counsel]: Correct."

As Robert acknowledges, he made a judicial admission that he could pay whatever reasonable amount the court ordered. See *People v. Gliniewicz*, 2020 IL App (2d) 190412, ¶ 45 ("A judicial admission is a formal act of the party or his attorney in court, dispensing with proof of a fact claimed to be true and is used as a substitute for legal evidence at the trial." (Internal quotation marks omitted.)). Thus, it would make no difference what the value of Robert's trust assets were.

That Robert argued he "ought not be required to further cannibalize his assets to pay Amanda additional child support beyond $10,000 a month when no increase in the child's needs have been shown" does not qualify his admission. Although Robert admitted he was capable of paying whatever reasonable amount the court ordered, this did not preclude him from arguing that an increase was not warranted. Accordingly, the circuit court did not abuse its discretion in denying Amanda access to Robert's trust-related documents.

¶ 29    B. The Circuit Court's Finding That There Was Not a Substantial Change in Circumstances Was Against the Manifest Weight of the Evidence

¶ 30    We review the circuit court's determination to grant or deny a modification of child support under two standards of review. We review the circuit court's determination of whether there is a substantial change of circumstances under the manifest weight of evidence standard. *In re Marriage of Yabush*, 2021 IL App (1st) 201136, ¶ 28. We review the circuit court's ultimate finding for abuse of discretion. *In re Marriage of Singleteary*, 293 Ill. App. 3d 25, 35-36 (1997). However, the interpretation of a marital settlement agreement, which is necessarily part of our analysis, is reviewed *de novo. Blum v. Koster*, 235 Ill. 2d 21, 33 (2009).

¶ 31    The circuit court denied Amanda's motion because it found she failed to demonstrate both "a substantial change in circumstances that was uncontemplated by either of the parties" and an "increase in the needs of the children." Typically, a substantial change in circumstances means that the obligor parent's ability to pay, the child's needs, or both have changed. *In re Marriage of Durdov*, 2021 IL App (1st) 191811, ¶ 22. The substantial change in circumstances may be based solely on the supporting parent's ability to pay. *In re Marriage of Yabush*, 2021 IL App (1st) 201136, ¶ 32. At issue here is whether the substantial increase in Robert's income in 2020 and 2021 was "based on events that were contemplated and expected by the trial court" at the time the

Judgment was entered. (Internal quotation marks omitted.) See *In re Marriage of Durdov*, 2021 IL App (1st) 191811, ¶ 22. A substantial change will not be found where the parties contemplated the present circumstances when they entered into the agreement. See *In re Marriage of Salvatare*, 2019 IL App (2d) 180425, ¶ 24.

¶ 32     We look to the terms of the MSA, which was incorporated into the Judgment, to determine if the parties contemplated Robert's substantial increase in income when they entered into the agreement. A marital settlement agreement is construed in the same manner as any other contract, and we must ascertain the parties' intent from the language of the agreement. *Id.* ¶ 27. The terms of the agreement must be given their plain and ordinary meaning, if unambiguous. *In re Marriage of Dundas*, 355 Ill. App. 3d 423, 426 (2005).

¶ 33     Regarding child support, section 4.1.3 of the MSA states:

"The parties acknowledge that Robert's annual gross income ranges from Six Hundred Thousand Dollars ($600,000) to One Million Six Hundred Thousand Dollars ($1,600,000) (and potentially more for 2015 only attributable to capital gains incurred for liquidation of securities needed for the funding of this settlement)[.]"

Also relevant to child support is section 12.6 of MSA, which states:

"Each party shall request that his or her tax preparer provide the other party with a written statement confirming whether his or her annual gross income for the previous tax year was within the range of annual gross income for him or her referred to in Section 4.1.3 above, and shall provide the statement with seven (7) days of filing his or her federal income tax returns for the previous tax year until both children are emancipated."

¶ 34     The MSA memorializes the parties' acknowledgment that Robert's income was between $600,000 to $1.6 million, but states that it could be higher in "2015 only attributable to capital

gains incurred for liquidation of securities needed for the funding of this settlement[.]" However, in 2020 and 2021, Robert's gross income was $2,019,048 and $3,641,757, respectively, well above the range specified in the MSA. Although minor increases in income do not necessarily constitute a substantial change in circumstances (see, *e.g.*, *In re Marriage of Connelly*, 2020 IL App (3d) 180193, ¶ 19 (finding a 10% increase in salary was not substantial enough to justify a modification of child support)), in 2020 Robert's income was 25% more than the top end of the range specified in the MSA, and in 2021 it was 127% percent more. The MSA identifies only one instance in which Robert's income could be higher in the future, that is, for 2015 if he needed to sell securities to fund his obligations under the MSA. Under a plain reading of the MSA, the parties did not contemplate Robert's substantial increase in income for purposes of section 510 of the Act.

¶ 35    Robert's substantial increase in income takes on added significance under the MSA's income verification clause. Both Robert and Amanda agreed to confirm in writing every year, until their children are emancipated, that their incomes remain within the range specified in the MSA. This indicates that the amount of their respective incomes was critical to their agreement on the amount of Robert's child support obligation. The only reason the parties would have agreed to an income verification clause until the children become emancipated is that they understood that Robert's child support obligation could change in the unexpected event that either his or Amanda's income was outside the range specified in the MSA. Otherwise, there would be no reason to include an annual income confirmation clause in the MSA.

¶ 36    Robert, however, argues that the plain language of the MSA shows that he and Amanda contemplated the substantial change in his income because the MSA makes him responsible for a 75% share of certain child-related expenses, such as childcare, extracurricular, and camp expense obligations. We disagree. Unlike marital settlement agreements that require a supporting parent to

pay a percentage of any additional income in child support (see, *e.g.*, *id.* ¶ 25 (marital settlement agreement's true-up provision that required father to pay 28% of any earnings he made in addition to the salary he was earning at the time of the dissolution showed that an increase in his earnings "was contemplated by the parties"); *In re Marriage of Durdov*, 2021 IL App (1st) 191811, ¶ 28 (the parties contemplated an increase in salary when supporting parent was required to pay "an amount equal to twenty-eight percent (28%) of any additional net income received from any other source including but not limited to bonuses, commissions, compensation for consulting projects, and other forms of income" (emphasis and internal quotation marks omitted))), the parties here agreed that Robert's child support obligation would remain fixed at $10,000 per month. In fact, the MSA expressly states that statutory guidelines child support was inappropriate in light of, *inter alia*, the parties' income. Accordingly, we do not find that the parties contemplated Robert's substantial increase in income simply based on his obligation to pay a disproportionate share of certain child-related expenses under the MSA.

¶ 37 Therefore, we conclude that the circuit court's finding that Amanda failed to establish a substantial change in circumstances that was uncontemplated by either of the parties was against the manifest weight of the evidence. *Cf. In re Marriage of Yabush*, 2021 IL App (1st) 201136, ¶ 42 ("[T]he parties' marital settlement agreement, as expressed in the agreed judgment for dissolution of marriage, contemplated only that petitioner's income would fluctuate due to his work as a salesman and did not contemplate that petitioner would form his own company, resulting in substantially increased income.").

¶ 38 Once the court finds a substantial change in circumstances, it must still decide whether to increase support and, if so, by what amount. *In re Marriage of Sassano*, 337 Ill. App. 3d 186, 194 (2003) (if the movant meets his burden to show a substantial change in circumstances, then the

trial court will consider whether and by how much to modify the child support); *In re Marriage of Barnard*, 283 Ill. App. 3d 366, 369-70 (1996) (same). Where statutory guidelines support does not apply under section 505 of the Act, the factors considered in setting any modified amount of support are the same as those used in initially determining support. *In re Marriage of Heil*, 233 Ill. App. 3d 888, 890 (1992). These factors include, but are not limited to:

"(A) the financial resources and needs of the child;

(B) the financial resources and needs of the parents;

(C) the standard of living the child would have enjoyed had the marriage *** not been dissolved; and

(D) the physical and emotional condition of the child and his or her educational needs." 750 ILCS 5/505(a)(2) (West 2020).

In determining whether to modify support, the court considers the equities. *Marriage of Heil*, 233 Ill. App. 3d at 891 (the change must "justify equitable action by the court in the best interests of the children" (internal quotation marks omitted)). So even where there is a substantial change in circumstances, the court has discretion to deny a motion to modify child support depending on the facts of each case.

¶ 39    Here, the circuit court found that "Amanda has failed to establish that there has been an increase in the needs of the children that warrants an increase in child support and/or a modification to child-related expenses." However, nothing in the record indicates that the circuit court considered the standard of living A.K. and T.K. would have enjoyed had the marriage not been dissolved, as required by section 505(a)(2)(c). *In re Marriage of Bussey*, 108 Ill. 2d 286, 296-98 (1985) is instructive. There, the noncustodial parent acknowledged a substantial change in circumstances and that he had the means to pay additional child support. *Id.* at 296. However, he

18

argued that in increasing child support, the circuit court abused its discretion by considering only "the standard of living the children would have enjoyed had the marriage not been dissolved" and claimed that the increase in support was more than what was necessary to provide for the children's needs. (Internal quotation marks omitted.) *Id.* at 296-97. Rejecting his argument, our supreme court stated:

> "To accept [the noncustodial parent's] argument that a child is only entitled to receive support for his basic 'shown needs' is to read the 'standard of living the child would have enjoyed had the marriage not been dissolved' consideration completely out of the statute. A child is not expected to have to live at a minimal level of comfort while the noncustodial parent is living a life of luxury. [Citations.] The child should not suffer because the custodial parent has a limited income. We decline to accept [the noncustodial parent's] argument that a child is only entitled to receive support for his 'shown needs' when the noncustodial parent is obviously 'enjoying' a standard of living far above that of the child." *Id.* at 297-98.

See *In re Keon C.*, 344 Ill. App. 3d at 1142 (child support obligee's net monthly income was nominal compared to child support obligor's net income and "clearly could not be considered sufficient to provide the reasonable needs of Keon C. taking into account *** the lifestyle Keon C. would have enjoyed had the parties not separated"); *In re Marriage of Rogliano*, 198 Ill. App. 3d 404, 412 (1990) (when a "noncustodial parent has the ability to pay support in excess of the stated needs of the child, a court may order child support in excess of the needs to enable the child to enjoy the standard of living he would have had if the marriage had not been dissolved"). Here, there is no serious dispute that as a consequence of Robert's substantial increase in income and

enhanced lifestyle, there now exists a wide disparity between the standard of living the children enjoy under Robert and the standard they enjoy under Amanda.

¶ 40     Because the court focused on a needs-based analysis and did not consider the standard of living the children would have enjoyed had the marriage not been dissolved, we reverse and remand for further proceedings to determine whether Robert's child support obligation should be increased. See *In re Marriage of Yabush*, 2021 IL App (1st) 201136, ¶ 40("[B]ecause we have determined that the trial court should have found that there was a substantial change in circumstances, we do not proceed to the second step of analyzing what a proper amount of support would be but leave that determination to the trial court to make in the first instance."); *In re Marriage of Armstrong*, 346 Ill. App. 3d 818, 823 (2004) ("Only after determining the threshold issue of whether a substantial change in circumstances has occurred can a court consider modifying a child support order."). In so doing, the circuit court shall consider the evidence already taken of the children's standard of living under each parent and any other relevant factor. And for the reasons explained below, the court shall hear and consider the testimony of Amanda's expert witnesses on the costs of the repairs and maintenance that her home requires. We express no opinion on the weight to be given to the evidence bearing on any single factor in deciding the amount by which Robert's child support obligation should be increased.

¶ 41                  C. The Circuit Court Abused Its Discretion in Barring

Amanda's Expert Witnesses

¶ 42     Amanda contends that the circuit court abused its discretion when it barred her experts from testifying about repairs that needed to be made to her home and the costs of those repairs. We review the circuit court's ruling on a motion *in limine* for abuse of discretion. *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 68 (2009). Before allowing expert testimony, the circuit court must

consider whether the testimony is relevant to a material fact in the case. *Bangaly v. Baggiani*, 2014 IL App (1st) 123760, ¶ 155.

¶ 43    We disagree with the circuit court's determination that the testimony of Amanda's experts regarding the repairs and maintenance needed to her home was not relevant. Amanda alleged, and the evidence at the hearing established, that the children enjoy a substantially enhanced standard of living in the new, lakefront home in Kenilworth when they are with Robert and a lower standard of living in the more modest home that is in need of repairs and upgrading when they are with Amanda. The expert testimony regarding the condition of Amanda's residence is relevant to both the needs of the children and the standard of living they would have enjoyed had the marriage not been dissolved. See *In re Marriage of Bussey*, 108 Ill. 2d at 297-98 (finding that the standard of living had the marriage continued and the needs of the children are both relevant considerations in a child support modification proceeding). On remand, we direct the circuit court to consider Amanda's experts' testimony; however, we express no opinion on the weight the circuit court should give to such testimony.

¶ 44                                    D. Attorney Fees

¶ 45    Finally, Amanda contends that the circuit court erred in denying her petition for attorney fees. She argues that the record does not support the court's finding that she failed to prove paying her fees would undermine her financial stability. Robert argues that the circuit court correctly determined that Amanda's financial stability would not be undermined because she has the resources to pay her fees.

¶ 46    The circuit court's decision to award attorney fees will not be disturbed absent an abuse of discretion. *In re Marriage of Heroy*, 2017 IL 120205 ¶ 13. The party seeking attorney fees must establish inability to pay and the other person's ability to do so. *In re Marriage of Schneider*, 214

Ill. 2d 152, 174 (2005). Financial inability exists where requiring payment of fees would strip the party of their means of support or undermine their financial stability. *Id.* Thus, "a party is unable to pay if, after consideration of all the relevant statutory factors, the court finds that requiring the party to pay the entirety of the fees would undermine [their] financial stability." *In re Marriage of Heroy*, 2017 IL 120205, ¶ 19.

¶ 47    Section 508 of the Act instructs that:

"The court from time to time, after due notice and hearing, and after considering the financial resources of the parties, may order any party to pay a reasonable amount for his own or the other party's costs and attorney's fees. Interim attorney's fees and costs may be awarded from the opposing party, in a pre-judgment dissolution proceeding in accordance with subsection (c-1) of Section 501 and in any other proceeding under this subsection. At the conclusion of any pre-judgment dissolution proceeding under this subsection, contribution to attorney's fees and costs may be awarded from the opposing party in accordance with subsection (j) of Section 503 and in any other proceeding under this subsection." 750 ILCS 5/508(a) (West 2020).

¶ 48    In light of our decision to reverse the circuit court's finding on the modification of child support and remand for further proceedings, we reverse the circuit court's denial of Amanda's petition for attorney fees as well and remand so that the circuit court reconsider both the modification of child support and petition for fees anew.

¶ 49                              III. CONCLUSION

¶ 50     For the foregoing reasons, we affirm the circuit court's denial of Amanda's discovery requests related to Robert's trust assets, reverse the circuit court's order barring Amanda's experts, reverse the circuit court's ordering denying Amanda's motion to modify child support, and reverse

the circuit court's denial of Amanda's petition for attorney's fees. We remand for further proceedings consistent with the opinion.

¶ 51    Affirmed in part and reversed in part; cause remanded.

---

*In re Marriage of Alpert Knight*, 2024 IL App (1st) 230629

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-D-3408; the Hon. Robert Johnson, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Jennifer L. Cantrell, Jason G. Adess, and Zora Ristanovic, of Berger Schatz LLP, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Marc D. Janser, Victoria Masciopinto, and Stanley C. Sneeringer, of Pedersen & Houpt, P.C., of Chicago, for appellee. |

---